# In the United States Court of Federal Claims

No. 07-712 C
(Filed under seal: November 15, 2007)
(Reissued: December 20, 2007)[1]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| PRECISION IMAGES, LLC,               * | |
|                               * | Post-Award Bid Protest; Cross- |
|         Plaintiff,         * | Motions for Judgment on the |
|                               * | Administrative Record; RCFC 52.1; |
| v.                             * | Standing; Prejudice; Rational Basis. |

PRECISION IMAGES, LLC,     \*

                       \*       Post-Award Bid Protest; Cross-

       Plaintiff,    \*       Motions for Judgment on the

                       \*       Administrative Record; RCFC 52.1;

v.                  \*       Standing; Prejudice; Rational Basis.

                       \*

THE UNITED STATES,     \*

                       \*

       Defendant,    \*

                       \*

and                  \*

                       \*

GE INSPECTION TECHNOLOGIES, LP,  \*

                       \*

       Defendant-Intervenor.    \*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

<u>Cyrus E. Phillips, IV</u>, Washington, DC, for plaintiff.

<u>Joseph E. Ashman</u>, United States Department of Justice, Washington, DC, for defendant.

<u>David A. Churchill</u>, Washington, DC, for Defendant-Intervenor.  Kevin C. Dwyer, of counsel.

### OPINION AND ORDER

**SWEENEY**, Judge

     This post-award bid protest is before the court on the parties' cross-motions for judgment on the administrative record pursuant to Rule 52.1 of the Rules of the United States Court of

---

[1] The court issued this Opinion and Order under seal on November 15, 2007.  The court directed the parties to submit proposed redactions by November 27, 2007.  After plaintiff and defendant disputed the extent to which the court should redact material, the court, in an order dated December 19, 2007, adopted defendant's proposed redactions.  The Opinion and Order reissued today incorporates these redactions, indicated by brackets, and corrects minor errors.

Federal Claims ("RCFC").  Plaintiff, Precision Images, LLC ("Precision" or "plaintiff"), challenges an award to Defendant-Intervenor GE Inspection Technologies, LP ("GE") under a solicitation issued by defendant, the United States, acting through the Department of the Air Force, Air Force Materiel Command ("Air Force" or "defendant").  The solicitation was issued for the procurement of Ultrasonic Flaw Detectors ("UFDs") for use as joint Department of Defense Services testing equipment.

Precision asks that this court: declare that the Air Force's award of the contract to GE lacked a rational basis, was arbitrary and capricious, was unlawful, and violated applicable procurement statutes and regulations; declare that Precision is entitled to equitable relief and money damages for the Air Force's breach of its implied-in-fact contract with Precision to act in good faith, engage in fair dealing, and honestly consider Precision's bid proposal; enjoin permanently GE's performance of the contract; direct the Air Force to award the contract to Precision;[2] and grant Precision any other relief this court deems just and proper.  For the reasons set forth below, Defendant's Motion for Judgment on the Administrative Record is granted, and Plaintiff's Cross-Motion for Judgment on the Administrative Record is denied.

## I.  FACTUAL BACKGROUND[3]

### A.  Solicitation

On April 5, 2007, the Air Force posted a Presolicitation Notice for the procurement of UFDs to the Federal Business Opportunities ("FBO") Internet website.[4]  AR 93-95.  UFDs "provide reliable means for performing ultrasonic inspections of aircraft metallic and non-metallic structures to include crack detection, corrosion testing, and thickness testing" and would be utilized by Air Force installations, by joint Department of Defense organizations, and for foreign military sales.  Id. at 93.  The Presolicitation Notice informed prospective bidders that the

---

[2]  In its Complaint ("Compl."), Precision seeks a permanent injunction terminating the contract awarded to GE and ordering the Air Force to redetermine a source selection based upon the existing proposals submitted and in compliance with applicable statutes and regulations. Compl. Prayer for Relief ¶ 2.  In its Response to the Cross-Motion for Judgment on the Administrative Record ("Pl.'s Resp."), Precision requests relief not specifically sought in the Complaint, namely, that the court order a directed award of the contract to Precision.  Pl.'s Resp. 5.

[3]  For purposes of ruling on the parties' motions, the factual background is derived from the administrative record ("AR").

[4]  The FBO website is "the single government point-of-entry (GPE) for Federal government procurement opportunities over $25,000.  Government buyers are able to publicize their business opportunities by posting information directly to FedBizOpps via the Internet." Federal Business Opportunities, available at http://FedBizOpps.gov (last visited Nov. 13, 2007).

"Government will utilize the Performance Price Trade-off (PPT) procedures, and will evaluate proposals and make award in accordance [with] the Evaluation Basis for Award provision" contained in the solicitation.  Id. at 94.

The Air Force issued solicitation number FA8533-07-R-11523 ("the solicitation" or "the RFP") for UFDs on April 20, 2007.  Id. at 95, 103.  The solicitation called for a five-year, firm-fixed price,[5] requirements-type,[6] indefinite-delivery contract[7] for one base-year period followed by four one-year option periods.[8]  Id. at 93-94, 105-11.  A source selection decision would be based on a best-value award determination procedure.  Id. at 129.  The contract, which the Air Force estimated was worth $4.4 million, would be awarded in accordance with Federal Acquisition Regulations ("FAR") Part 12 and Part 15.[9]  Id. at 90; cf. id. at 746 (estimating the contract's total value at $4.3 million).

## 1. Product Description

The contract requirements were enumerated in the solicitation and an accompanying Product Description.  Id. at 96-102, 103-31.  The Product Description "defines the minimum

---

[5]  A firm-fixed price contract "provides for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract."  48 C.F.R. § 16.202-1 (2006).  This type of contract "is suitable for acquiring commercial items . . . or for acquiring other supplies or services on the basis of reasonably definite functional or detailed specifications . . . ."  Id. § 16.202-2.

[6]  A requirements contract "provides for filling all actual purchase requirements of designated Government activities for supplies or services during a specified contract period, with deliveries or performance to be scheduled by placing orders with the contractor."  Id. § 16.503(a).  Contracting officers must provide a "realistic estimated total quantity" in the solicitation and resulting contract, though the estimate is not a representation that the estimated quantity will be required or ordered.  48 C.F.R. § 16.503(a)(1).

[7]  There are three types of indefinite-delivery contracts: definite-quantity contracts, requirements contracts, and indefinite-quantity contracts.  48 C.F.R. § 16.501-2(a).  An indefinite-quantity contract "provides for an indefinite quantity, within stated limits, of supplies or services during a fixed period.  The Government places orders for individual requirements.  Quantity limits may be stated as number of units or as dollar values."  Id. § 16.504(a).  The Government must order, and the contractor must furnish, "at least a stated minimum quantity of supplies or services."  Id. § 16.504(a)(1).

[8]  The best estimated quantity of UFDs to be delivered under the contract was 700: 160 units for the base period; 160 units for option year I; 135 units each for option years II and III; and 110 units for option year IV.  AR 105-12.

[9]  See 48 C.F.R. §§ 12.000-.603, 15.000-.609.

performance and technical requirements for a lightweight microprocessor-based ultrasonic flaw detection and thickness testing instrument for Nondestructive Inspection (NDI) use in a military aircraft maintenance environment . . . ."  Id. at 96.  The Product Description contained requirements relating to, inter alia, battery, instrument display, computer interface, and environmental conditions specifications; necessary accessories; operational and technical manuals; and vendor/contractor points of contact for service and support.[10]  Id. at 96-102.

## 2.  Proposal Requirements

The solicitation required offerors to submit their proposals in two separate volumes.  Id. at 126.  In Volume I, offerors were to submit a completed, signed RFP "with a cover letter delineating any exceptions taken to the RFP terms and conditions" and proposed pricing.  Id.  In Volume II, offerors were to submit information about the offeror's past and present performance utilizing a "FACTS Sheet."[11]  Id.  The solicitation indicated that FACTS Sheets must contain

---

[10]  One particular technical requirement contained within the initial Product Description concerned the UFDs' pulse width:

> 2.4.2.1 Pulse Width.  The pulser shall generate the required amplitude pulse over an adjustable range of at least 30 ns minimum to 1000 [ns] maximum as measured at the half power (50% amplitude) points.  The test set shall display the value of this parameter within 10% of its actual value or 10 ns whichever is larger.  Step size requirements are 10 ns minimum.

AR 99; see infra notes 33 & 35 and accompanying text.

[11]  The FACTS Sheet template was appended to the solicitation as attachment 1.  See AR 132-36.  FACTS Sheets were required

> for each active or completed contract (with preferably at least one year of performance history) **in the past three (3) years**, that the offeror considers relevant in demonstrating its ability to perform the proposed effort.  **If the total number of such contracts exceeds four (4), the offeror shall address its four (4) most relevant contracts** . . . .  The offeror's present and past performance information may include data on efforts performed by other divisions or corporate management, if such resources will be used and significantly influence the performance of the proposed effort.  Contracts listed may include those with the Federal Government, state and local Governments or their agencies, and commercial customers.  Offerors that are newly formed entities without prior contracts or that do not possess relevant corporate past performance should submit FACTS Sheets for four (4) of their most recent/relevant contracts demonstrating the present and past performance for each of their key personnel.

clear and concise responses "**which correlate present and past performance with the requirements of this RFP. The FACTS Sheet submitted by the offeror must clearly describe the relevance of the effort to the work proposed by that entity.**" Id. at 127. The solicitation further explained that offerors were required to send attached "Present/Past Performance Questionnaires" to each contact identified in the offeror's FACTS Sheet. Id. The FACTS Sheet advised offerors that the Air Force "**is not bound by the offeror's opinion of relevancy. The Government will perform an independent assessment of relevancy of the data provided or obtained.**" Id. at 135.

### 3. Evaluation Basis for Award Provision

The solicitation also contained an Evaluation Basis for Award ("EBA") provision, which described the methodology upon which the requirements-type contract award would be determined. Id. at 129-31. The EBA indicated that the "acquisition will utilize the Performance/Price Tradeoff (PPT) source selection procedure to make an integrated assessment for a best value award decision." Id. at 129; see also id. at 93-94 (stating in the Presolicitation Notice that the PPT source selection would be utilized). It explained that

> [t]radeoffs will be made between present/past performance (hereafter referred to as performance) and price, with performance being considered significantly more important than price. **While the Government will strive for maximum objectivity, the tradeoff process, by its nature, is subjective; therefore, professional judgment is implicit throughout the selection process.**

Id. at 129. Therefore, the EBA informed offerors that two criteria, present/past performance and price, would be traded off with the former accorded greater weight. Id.

### a. Performance Assessment

The performance component of the PPT evaluation process "assess[ed] the confidence in the offeror's ability to successfully accomplish the proposed effort based on the offeror's demonstrated present and past work record." Id. The solicitation indicated that the Air Force "will evaluate the offeror's demonstrated record of contract compliance in supplying products and services that meet users' needs, including cost and schedule." Id. The Air Force would also assess the "currency and relevancy of the information, the source of the information, context of the data and general trends in the contractor's performance . . . ." Id. Additionally, it would "perform an independent determination of the relevancy of the data provided or obtained," including the offeror's present/past performance. Id. Like the FACTS Sheet, the EBA provision also advised offerors that the Air Force was "not bound by the offeror's opinion of relevancy." Id.

---

Id. at 127.

The EBA provision also explained that the Air Force would rely upon specific criteria in order to determine whether an offeror's present and past work record was "Very Relevant," "Relevant," "Somewhat Relevant," or "Not Relevant." "Very Relevant" present/past performance efforts

> involved the magnitude of work and complexities that are **essentially** what this solicitation requires. Examples . . . include the manufacture of handheld lightweight ultrasonic flaw detectors which contain all of the following features: color display; selectable spike/excitation and square wave pulser with adjustable voltage; capability to freeze and store screen displays; the capability to program, store, and recall instrument test parameter settings; pulse repetition frequency from 50 to 4000 Hz automatically coupled to the display and gates; and pulser modes of operation of pulse-echo, through-transmission, and pitch-catch; probes for: thickness, longitudinal wave, and shear wave.

Id. "Relevant" present/past performance efforts

> involved less magnitude of work and complexities, **including most** of what this solicitation requires. Examples . . . include the manufacture of handheld lightweight ultrasonic nondestructive inspection equipment with multi-mode testing capability and probes and contain all of the following features: color display; capability to freeze and store screen displays; the capability to program, store, and recall instrument test parameter settings.

Id. The EBA's definition for "Somewhat Relevant" present/past performance efforts

> involved much less magnitude of work and complexities, **including some** of what that [sic] this solicitation requires. Examples of such efforts include the manufacture of a microprocessor based inspection equipment with a display; capability to freeze and store screen displays; capability to program, store, and recall test settings and memory retention.

Id. at 130. Finally, "Not Relevant" present/past performance efforts "do not involve any significant aspects of the ["Very Relevant," "Relevant," and "Somewhat Relevant"] definitions." Id. In addition, the EBA advised offerors that the phrase "magnitude of work and complexities," as utilized in these relevancy criteria, was defined as follows:

> **NOTE:** **Magnitude of work and complexities includes, but is not limited to, logistical and programmatic considerations such as total quantity produced and/or quantity produced per month, duration of time, program dollar value, and type of contract.**

Id.

The EBA further explained that the Air Force could employ at least five approaches during its assessment of present and past performance. First, performance information could have been obtained from references provided by the offeror in the solicitation as well as from other sources, including overall customer satisfaction and conclusions of informed judgment. Id. Second, offerors were afforded an opportunity to address adverse past performance information "if the offeror has not had a previous opportunity to respond to the information." Id. Third, an offeror that "d[id] not have a past performance history deemed relevant to this solicitation . . . will receive an unknown confidence rating. The unknown confidence rating [would] be considered in the overall assessment for a best value decision." Id. Fourth, assessments evaluated present and past performance demonstrating compliance with FAR § 52.219-8, Utilization of Small Business Concerns. Id.

Finally, the EBA indicated that offerors would receive an "overall confidence assessment rating":

| Rating | Definition |
|---|---|
| High Confidence | Based on the offeror's performance record, the Government has high confidence that the offeror will successfully perform the required effort. |
| Significant Confidence | Based on the offeror's performance record, the Government has significant confidence that the offeror will successfully perform the required effort. |
| Satisfactory Confidence | Based on the offeror's performance record, the Government has confidence that the offeror will successfully perform the required effort. Normal contractor emphasis should preclude any problems. |
| Unknown Confidence | No performance record identifiable (see FAR [§§] 15.305(a)(2)(iii) and (iv)).[12] |

---

[12] FAR § 15.305(a)(2)(iii)-(iv) provides:

(iii) The evaluation should take into account past performance information regarding predecessor companies, key personnel who have relevant experience, or subcontractors that will perform major or critical aspects of the requirement when such information is relevant to the instant acquisition.

| Little Confidence | Based on the offeror's performance record, substantial doubt exists that the offeror will successfully perform the required effort. |
| No Confidence | Based on the offeror's performance record, extreme doubt exists that the offeror will successfully perform the required effort. |

Id. at 130-31 (footnote added).

### b. Cost/Price Assessment

The cost/price assessment component of the PPT evaluation process evaluated each offeror's proposal for reasonableness, balanced pricing, and total evaluated price ("TEP"). Id. at 131. First, with respect to reasonableness, the Air Force anticipated the existence of adequate price competition. Id. Second, with respect to balanced pricing, the Air Force

> shall analyze offers to determine whether they are unbalanced with respect to separately priced line items or sub-line items. Prices proposed will be compared and evaluated to assure that a logical progression exists as related to price and quantity changes within each offeror's response to the pricing structure in the Schedule.

Id. Third, with respect to TEP calculations, determinations would be made based upon the presence or absence of quantity ranges indicated on a Contract Line Item Number ("CLIN").[13] Id.

---

(iv)  In the case of an offeror without a record of relevant past performance or for whom information on past performance is not available, the offeror may not be evaluated favorably or unfavorably on past performance.

48 C.F.R. § 15.305(a)(2)(iii)-(iv).

[13]  For example, in the absence of quantity ranges, the evaluated price was calculated by multiplying the proposed unit price by the corresponding fixed quantity, yielding a TEP. Where quantity ranges were indicated, the evaluated price was calculated by multiplying each proposed unit price by the corresponding quantity range, which yielded a total price for that line item. The sum of these evaluated prices for each line item represented the TEP. AR 131.

### c. Technical Evaluation

The solicitation did not set forth a technical evaluation that the Air Force would utilize to assess the offerors' proposed UFD products. See id. at 129-31. Instead, the solicitation required that offerors "provide . . . [a UFD] in accordance with the Product Description . . . dated 12 April 2007 referenced in this document." Id. at 105. As stated above, the Product Description established the "minimum performance and technical requirements" for the proposed UFDs. Id. at 96; supra Part I.A.1. Technical evaluations were complete once the Air Force determined that the proposed UFDs satisfied these minimum performance and technical requirements, and the Air Force concluded that "[a]ll of the [UFDs] being proposed satisfy the requirements of our [Product Description]." AR 690.

### 4. The Proposals

Following the April 20, 2007 posting of the Air Force's solicitation on the FBO website, several prospective offerors submitted questions regarding the specifications contained in the Product Description. See id. at 155-56, 162-63, 169, 170-72, 186-88, 189-90. These questions, and the corresponding answers supplied by the Air Force Contracting Specialist, were made available on the FBO website. Id. at 95, 162-63. GE submitted a series of technical questions based upon the Product Description. Id. at 171. One question GE submitted asked the importance of or application for the lower end 30 ns requirement contained within the pulse width provision, section 2.4.2.1, in the Product Description. Id.; supra note 10. The Air Force responded to GE's question by stating that the "pulse width/shape of 30[ ]ns delivers the frequency suitable for AF ultrasonic nondestructive inspection requirements." AR 182. But see infra Part I.A.4.a (permitting a deviation from that requirement). Additional questions and answers, compiled on May 8, 2007, were posted on the FBO website on May 9, 2007. AR 95, 181-83, 195-97.

Precision, GE, and a third offeror submitted proposals on or before May 24, 2007, the closing date set by the Air Force for receipt of bids. Id. at 152, 749. Shortly thereafter, the Air Force commenced issuance of Evaluation Notices ("ENs"), which provided initial findings and afforded an opportunity for submission of proposal revisions, to the offerors. Id. at 546-609. The Air Force concluded discussions on the bids with offerors on September 7, 2007, and final proposals were due no later than September 12, 2007. Id. at 350-51, 522-23. Precision, GE, and a third offeror submitted final proposals. Id. at 779-86.

### a. Air Force Evaluation of GE's Proposal

GE submitted its proposal on May 16, 2007. Id. at 315. In conformity with the proposal requirements, see id. at 126, GE accompanied its submission with a cover letter delineating exceptions to the Product Description and contract clauses. Id. at 315. One exception GE made concerned pulse width, the subject of the above-described question GE previously submitted to the Air Force. Specifically, GE represented that its proposed product, the USN 60 pulser, "has a

voltage control from 50 to 450 volts in 10-volt steps and achieves 50 n[s] to 1,000 n[s] over that entire range.  This range of pulser width adjustment allows for optimum performance for the transducers in this specification."  Id. at 317; cf. supra note 10.

The Air Force acknowledged that GE's exception was a deviation from the specifications contained in the Product Description; however, it noted that GE was "proposing . . . an upgrade" that had already been used by the Air Force with success.  AR 67.  The Air Force therefore determined that a "deviation from 30[ ns] to 50 n[s] could be granted," id., and drafted a revision to the product description.  Id. at 73-79.  On July 13, 2007, the Air Force issued Amendment 0003 modifying the pulse width requirement contained in the Product Description from "at least 30 ns minimum to 1000 n[s] maximum," id. at 99, to "at least 50 ns minimum to 1000 n[s] maximum."[14]  Id. at 154, 944.

GE submitted four present and past performance FACTS Sheets with its proposal that it believed were relevant.  Id. at 293-99, 307-13, 325-31, 341-47.  Each FACTS Sheet for these previous contracts described firm-fixed price contracts.  Id.  The Air Force determined that two of the four contracts exceeded the three-year time frame permitted under the solicitation.[15]  See id. at 293-99, 325-31, 694-701, 783; supra note 11.  The remaining two contracts the Air Force considered involved the manufacture of UFDs.  AR 307-13, 341-47, 759-60.

GE's FACTS Sheet for the first firm-fixed price contract indicated that it was for the manufacture of [  ] UFDs for the Department of the Navy ("the Navy") in April 2007 ("the 2007 GE contract").[16]  Id. at 307-13.  The value of this contract at completion was [  ].  Id. at 307, 310.  In the space provided to identify unique aspects of the contract, GE described the key features of its product, the USN 60 pulser, with specificity.  Id. at 311.  GE completed the FACTS Sheet relevancy table for the 2007 GE contract in its entirety and indicated that the program was similar to the proposed effort contained in the solicitation.  Id. at 313.

GE's FACTS Sheet for the second firm-fixed price contract that the Air Force considered indicated that it was for the manufacture of [  ] UFD for the Navy between January and April

---

[14]  Amendment 0001 modified the closing date for basic bids from May 21, 2007 to an indefinite date.  AR 151.  Amendment 0002 modified the closing date for solicitations from an indefinite date to May 24, 2007.  Id. at 151-52.

[15]  One of these contracts that was not considered initially received a "Very Relevant" determination by the Air Force.  AR 692.  This contract was not considered in the final performance report.  Id. at 759-60.

[16]  Under the 2007 GE contract, the Navy purchased the same model UFD that GE proposed under this solicitation.  See AR 308, 317.

2004 ("the 2004 GE contract").[17]  Id. at 341.  The value of this contract at completion was [   ].
Id.  In the space provided to identify unique aspects of the contract, GE again described the key
features of its USN 60 pulser product with specificity.  Id. at 345.  GE completed the FACTS
Sheet relevancy table for the 2004 GE contract in its entirety and indicated that the program was
similar to the proposed effort contained in the solicitation.  Id. at 347.

Not bound by GE's opinion of relevancy contained in its FACTS Sheets, see id. at 135,
the Air Force's Performance Confidence Assessment Group ("PCAG") made its own relevancy
assessment.  The PCAG determined that both of GE's previous contracts were "Somewhat
Relevant."  Id. at 549, 759-60.  The PCAG final performance report elaborated upon these
determinations.  Id. at 759-60.  With respect to the 2007 GE contract, the PCAG found:

[   ].

Id. at 759.  But see id. at 129 (indicating in the EBA that these features were considered "Very
Relevant").  The PCAG explained that [   ].  Id. at 759.  As a result, the 2007 GE contract was
deemed "**somewhat relevant** because in overall terms of complexity and magnitude the effort
involved the manufacture of only [   ] with an approximate value of [   ]."  Id.

The PCAG made the same determination for the 2004 GE contract.  It found that the
effort contained all the same features as the 2007 GE contract; however, [   ].  Id. at 760.  As a
result, the 2004 GE contract was deemed "**somewhat relevant** because in overall terms of
complexity and magnitude the effort involved the manufacture of only [   ] with an approximate
value of [   ]."  Id.

The administrative record indicates that the Air Force received six present/past
performance questionnaires for GE.  Id. at 694-719.  But see id. at 760 (indicating that two
questionnaires were received).  Of these, three were not considered because they were outside the
three-year performance history period, id. at 694-702, 707-710; supra note 11.  Two were not
considered because they evaluated GE in the capacity of vendor.  AR 703-06, 711-14.  The Air
Force considered the remaining questionnaire, which it described as rating GE's "performance as
excellent."  Id. at 760.  The Air Force also conducted an interview, which described a favorable
performance by GE.  Id. at 719, 760.

GE also submitted previous government and commercial sales information for its USN
60 pulser product.  Id. at 333-34.  While GE listed [   ] government sales, the PCAG determined
that only [   ] occurred within the three-year performance history period specified in the
solicitation.  Id. at 334, 760.  It concluded that, in terms of complexity and magnitude, those [   ]
efforts "involved quantity ranges from [   ] units with an approximate value ranging from [   ] to
[   ] per effort; total units sold within the three year period was [   ] with an approximate value of

---

[17]  This contract also involved the same model UFD that GE proposed under this
solicitation.  See AR 317, 342.

[  ].” Id. at 760-61.  While GE listed [  ] commercial sales, the PCAG determined that only [  ] were within the three-year performance history period specified in the solicitation.  Id. at 333.  It concluded that, in terms of complexity and magnitude, those [  ] efforts “involved quantity ranges from [  ] units with an approximate value ranging from [  ] to [  ] per effort; total dollar value for the [  ] efforts is approximately [  ].”  Id. at 761.  As a result, the PCAG found that these past efforts “involved little of the magnitude of work and complexities that this solicitation requires.”  Id.

In summary, the PCAG stated:

[  ].

Based on all the information set forth herein, the PCAG has **Satisfactory Confidence** that based on the offeror’s performance record[,] the Government has confidence that the offeror will successfully perform the required effort.[18]

Id. at 762 (footnote added).  The same evaluation was made in the Air Force’s Source Selection Decision Document (“SSDD”).  Id. at 783.

The PCAG’s Final Performance Report also identified GE’s strengths.  Specifically, the Air Force noted positive customer comments about the quality and intuitive operation of its product as well as its customer support.  Id. at 763.  The Air Force identified no weaknesses.  Id.

With regard to the Air Force’s cost/price evaluation, GE received a total of five pricing EN’s.  See id. at 576-86, 784.  The Air Force determined that its ENs “were answered satisfactorily” by GE.  Id. at 791.  GE’s initial proposal, submitted in May 2007, was for [  ].  Id. at 788.  Its total evaluated price before release of the final proposal request in July 2007 was increased to $3,867,120, and that amount remained unchanged in its September 2007 final proposal.  Id.  The Air Force’s final price competition memorandum indicated that GE’s proposal was balanced and within the competitive range.  Id. at 791.

**b.  Air Force Evaluation of Precision’s Proposal**

Precision initially submitted its solicitation proposal via electronic mail on May 21, 2007.  Id. at 191.  That submission highlighted features of its proposed UFD unit and included an annotated copy of the Product Description, which indicated that Precision’s product met or exceeded the technical specifications.  Id. at 191, 445-51.  Because Precision failed to follow the format required by the solicitation, the Air Force requested that Precision “review the RFP

---

[18]  On July 19, 2007, GE responded to the Air Force’s ENs.  AR 548-75.  It indicated that it “agree[d] with the Government’s overall confidence level of ‘satisfactory’ as it is based on the limited past effort data we submitted in our bid.”  Id. at 549.

proposal requirements and the evaluation basis for award and prepare [its] response in accordance with the directions."  Id. at 191.

Precision resubmitted its solicitation proposal on May 21, 2007.[19]  Id. at 386.  In conformity with the proposal requirements, see id. at 126, Precision accompanied its submission with a cover letter.  Id. at 386.  Precision indicated that its proposal contained "no product exceptions."  Id.  It further indicated in its cover letter that "[a]ll criteria requested in [the Product Description are] met or exceeded" by its proposed UFD unit.  Id.  Additionally, Precision noted: "[Precision] would also like to bring to your attention that the relevancy of the Present/Past Performance has historically been for other products.  The color UT unit offered . . . is a new product for us."  Id.

Precision submitted five present and past performance FACTS Sheets with its proposal.  Id. at 418-42.  But see supra note 11 (indicating that offerors shall address only their four most relevant contracts).  Four of the five FACTS Sheets concerned firm-fixed price contracts.  AR 496-520.  The fifth FACTS Sheet identified a time-and-materials contract,[20] which the Air Force did not consider.[21]  Id. at 631-35, 781.  Precision's initial FACTS Sheets either provided limited or no information about the four firm-fixed price contracts.  Id. at 418-42.  Consequently, the Air Force issued an EN to Precision in which it stated that Precision "failed to complete the FACT[S S]heet[s] for these efforts; therefore, the PCAG has determined these efforts not relevant at this time."  Id. at 596.  The Air Force determined that these four contracts were not relevant and "assessed an **unknown confidence** level that [Precision] will successfully perform the [UFD] program because the efforts involved little or none of the magnitude of work and complexities that this solicitation requires pursuant to the definitions of relevancy provided in the RFP."  Id.

The EN also advised Precision that it may "provide additional/revised information on the efforts previously submitted which may impact the Government's determination of relevancy, or want to substitute efforts for one(s) already submitted which may impact the Government's

---

[19]  Precision's cover letter indicated that its proposal was dated May 21, 2007; however, Precision represents in its statement of facts accompanying its Cross-Motion for Judgment on the Administrative Record ("Pl.'s Mot.") that it submitted its proposal on May 23, 2007.  Regardless of the discrepancy between these two dates, Precision's proposal was submitted before the May 24, 2007 closing date.  See supra note 14.

[20]  A time-and-materials contract "provides for acquiring supplies or services on the basis of (1) direct labor hours at specified fixed hourly rates that include wages, overhead, general and administrative expenses, and profit and (2) materials at cost, including, if appropriate, material handling costs as part of material costs."  48 C.F.R. § 16.601.

[21]  Since the Air Force did not consider the time and materials contract, information pertaining to and contained within Precision's fifth FACTS Sheet for that contract is not discussed here.  AR 631-35, 781.

determination of relevancy . . . ."  Id.; see also id. at 751 (noting that the EN permitted Precision to "review its performance record for efforts that have any relevance pursuant to the relevancy definitions in the RFP and submit such for evaluation").  The Air Force stated that Precision's response to this EN "did not indicate agreement or disagreement with the Government's overall confidence assessment determination."  Id. at 751.  Precision subsequently provided a spreadsheet of past and present performance information, but it did not provide completed FACTS Sheets.  Id. at 597, 609.  Because Precision "failed to enclose completed FACT[S S]heets," id. at 751, the Air Force issued a subsequent EN requiring Precision to provide "complete FACT[S ]heets for each of [the] efforts submitted.  Additionally[,] the offeror will identify which Present/Past Performance Questionnaire goes with which effort."  Id. at 609.  Precision subsequently submitted revised, completed FACTS Sheets.  Id. at 611-35.

The revised FACTS Sheets Precision submitted involved purchase orders for high speed film delivered to four Air Force bases.  Id. at 611-30.  Precision's FACTS Sheet for the first firm-fixed price contract that the Air Force considered indicated that it was for an order of [   ] discontinued high speed film rolls.[22]  Id. at 615.  The period of performance spanned from November 1 through November 23, 2005, id. at 611-12, and the estimated value of this contract at completion was [   ].  Id. at 611.  But see id. at 613 (indicating an estimated value of [   ] at contract completion).  Precision noted that the product was discontinued and that it was no longer available.  Id. at 612.  Although the orders were filled on time by Precision, "due to manufacturer stock depletion," the order "was closed short 19 [film] rolls."  Id. at 611.  Precision added: "The items supplied were different than to [sic] the proposed effort[;] however[, the contract] relates in the fashion that delivery dates were met and no issues were involved."  Id. at 612.  Precision completed the FACTS Sheet relevancy table for this contract and noted that most of the efforts were "n/a," or not applicable, to the effort proposed in the solicitation.  Id. at 615.

Precision's FACTS Sheet for the second firm-fixed price contract that the Air Force considered indicated that it was for an order of [   ] discontinued high speed film rolls.  Id. at 617-18; cf. id. at 616 (indicating that the customer increased quantity of film rolls from [   ] to [   ] and from [   ] to [   ]).  The period of performance spanned from November 4 through December 17, 2004, id. at 617, and the estimated value of this contract at completion was [   ].  Id. at 616, 618.  Precision noted that these film rolls were "discontinued and availability would be no longer [sic].  We were able to fulfill the quantities minus 19 due to the manufacturing 'end of life' for this item."  Id. at 617.  Precision added: "The items supplied were different than to [sic] the proposed effort[;] however[, the contract] relates in the fashion that delivery dates were met and no issues were involved."  Id.  Precision completed the FACTS Sheet relevancy table for this contract and noted that most of the efforts were "n/a," or not applicable, to the effort proposed in the solicitation.  Id. at 620.

---

[22]  Precision indicated that this order, originally placed for [   ] rolls, was subsequently increased to [   ] by the customer.  AR 611.

Precision's FACTS Sheet for the third firm-fixed price contract that the Air Force considered indicated that it was for several orders of discontinued high speed film rolls totaling [   ] units.[23]  Id. at 622-23.  The period of performance spanned from March 24 through June 6, 2005,[24] id., and the estimated value of this contract at completion was [   ].  Id. at 621, 623.  Precision indicated that this order "was shipped in full, including customer's additional quantity requests."  Id. at 622.  It also stated that "[t]he product supplied is different but we are able to establish [that] the delivery time goals were met along with exceeding the original order quantity and fulfilling additional items per the customer's request."  Id.  Precision completed the FACTS Sheet relevancy table for this contract and noted that most of the efforts were "n/a," or not applicable, to the effort proposed in the solicitation.  Id. at 625.

Precision's FACTS Sheet for the fourth firm-fixed price contract that the Air Force considered indicated that Precision was the subcontractor for shipping orders of discontinued high speed film rolls totaling [   ] units.  Id. at 626-28.  The period of performance spanned from November 1 through December 10, 2004, id. at 627-28, and the estimated value of this contract at completion was [   ].  Id. at 626.  Precision indicated that the "[m]anufacturer was doing last fulfillments of this product and we were able to supply the customer with last time purchases."  Id. at 627.  It also stated that "[i]tems supplied were different than to [sic] the proposed effort[;] however[, the contract] relates in the fashion that delivery dates and quantities ordered were met and exceeded."  Id.  Precision completed the FACTS Sheet relevancy table for this contract and noted that most of the efforts were "n/a," or not applicable, to the effort proposed in the solicitation.  Id. at 630.

In the space provided to identify unique aspects of these contracts, Precision noted on all of the FACTS Sheets it submitted that it

> was able to obtain a large portion of this film from the manufacturer prior to the discontinuation of the product.  We were one of the only resellers of this product at that time.  We had the capabilities to track the progress of the orders and also monitor the manufacturer's supply to keep the customer informed.

Id. at 613; see also id. at 618-19, 623, 628.

Not bound by Precision's opinion of relevancy contained in its FACTS Sheets, id. at 135, the Air Force's PCAG made its own relevancy assessment.  In its Final Performance Report, the PCAG determined that all four of Precision's previous contracts were "Not Relevant."  Id. at 596, 749-51.  It made the following determination for all of Precision's past performances:

---

[23]  The customer placed an initial order of [   ] rolls, followed by additional orders of [   ] and [   ] rolls.  AR 622.

[24]  The signed contract was returned to Precision on March 28, 2005.  Delivery estimation from the manufacturer was set between four and six weeks.  AR 622.

[   ].  The PCAG determined this contract to be **not relevant**.

Id. at 749-51.  The Air Force also indicated that, after it submitted ENs to Precision, Precision supplied information about "[   ] additional efforts for film sales totaling approximately [   ]; this additional data did not add to nor detract from the initial confidence assessment."  Id. at 751. The PCAG also stated that the spreadsheet Precision submitted, see id. at 609, summarized Precision's FACTS Sheets, included information about the time and materials contract, and detailed contracts "for film sales in lieu of listing all contracts that the offeror is performing or has performed in the past three years.  [   ] contracts were identified for film sales . . . [and t]he quantities ranged from [   ] each to [   ] each with dollar values from [   ] to [   ]."  Id. at 751.

The administrative record indicates that the Air Force received three present/past performance questionnaires for Precision.  Id. at 720-31.  Two of the three questionnaires indicated that Precision was a vendor/supplier.  Id. at 720-23, 728-31.  The remaining questionnaire rated Precision as "exceptional" in all categories.[25]  Id. at 726.

In summary, the PCAG stated:

> All four efforts described on [Precision's] FACTS Sheets are considered not relevant to the instant requirement because the submitted efforts were for film sales.  [   ].
>
> [   ].
>
> The PCAG has **Little Confidence** that[,] based on the offeror's performance record[,] substantial doubt exists that [sic] the offeror will successfully perform the required effort.

Id. at 752.  The same evaluation was made in the Air Force's SSDD.  Id. at 781.

With regard to the Air Force's cost/price evaluation, Precision received a total of three pricing ENs.  See id. at 594-95, 599-603, 783.  The first two ENs prompted Precision to revise its pricing for several CLINs and Sub-CLINs.  See id.  The Air Force issued a third EN wherein it analyzed Precision's pricing revisions from the previous two EN's and indicated several disparities.  Id. at 607, 783.  In response to this third EN, Precision indicated that no errors were made.  Id.  Precision's initial proposal, submitted in May 2007, was for [   ].  Id. at 788.  Its total evaluated price before release of the final proposal request in July 2007 was increased to [   ], and its final proposal revision in September 2007 was reduced to $3,101,575.  Id.  The SSDD indicated that Precision's pricing for four CLINs were not balanced.  Id. at 785.  But see id. at 791 (indicating, in the Air Force's final price competition memorandum, that all proposals, including Precision's, were balanced and within the competitive range).

---

[25]  The information contained in the questionnaire is not discussed in the PCAG's Final Performance Report.  See AR 749-52.

-16-

**B.  Award**

On September 14, 2007, the Air Force issued its SSDD, which analyzed the three submitted proposals.  Id. at 779-86.  The SSDD reiterated that the acquisition would "utilize the Performance/Price Tradeoff (PPT) source selection procedure to make an integrated assessment for a best value award decision; tradeoffs would be made between performance and price with performance being considered significantly more important than price."  Id. at 786.

The SSDD evaluated the offerors' past and present performance and adopted the findings contained in the PCAG's final performance report.  See id. at 746-63, 779-83.  The following summarizes the offerors' performance assessments:

| Offeror | Present and Past Performance Evaluation |
|---------|------------------------------------------|
| Precision Images, LLC | Little Confidence |
| GE Inspection Technologies, LP | Satisfactory Confidence |
| Third Offeror | Satisfactory Confidence |

Id. at 780-83.

The SSDD also evaluated each offeror's cost/price.  Id. at 783.  Prices were evaluated in three areas: reasonableness, total evaluated cost/price, and balance.  Id.  Each offeror's price was reasonable.  Id. at 785.  The following were the total evaluated prices:

| Offeror | Total Evaluated Price |
|---------|------------------------|
| Precision Images, LLC | $3,101,575 |
| GE Inspection Technologies, LP | $3,867,120 |
| Third Offeror | $5,437,750 |

Id. at 785.  The SSDD summarized that Precision "was assessed with a little confidence rating with its price being the lowest."  Id.  GE was "assessed with a satisfactory confidence rating with its price being the second lowest."  Id.  The third offeror "was assessed with a satisfactory confidence rating and had the highest price among the offerors."  Id.

Because the performance assessment determined the level of confidence the Air Force had in an offeror's ability "to successfully accomplish the proposed effort based on the offeror's demonstrated past and present work record," the Air Force found that "it would be implausible . . . to select an offeror with a little confidence rating over one that was assigned a

confidence rating of satisfactory." Id.  The Air Force "look[ed] closely" at the confidence rating and proposed pricing.  Id.  Precision, the SSDD concluded, "failed to demonstrate through its recent, current, and relevant performance history, that it has the experience to successfully perform the complexity, magnitude, and scope of the [UFD] effort."  Id.  Like the third offeror, GE was assessed a "satisfactory assessment" but, unlike the third offeror, proposed "the lowest price [between] the two."  Id.

The SSDD concluded that, "[b]ased upon the information presented . . . and in adherence to the 'Evaluation Basis for Award' provision in the RFP, the best value award for this solicitation is determined to be GE . . . ."  Id. at 786.  On September 26, 2007, the Air Force awarded the contract to GE.  Id. at 787.

## II.  PROCEDURAL HISTORY

The Air Force notified Precision by letter on September 26, 2007, that its proposal "was not the most advantageous to the Government.  The Government's decision is based on the factors established in the [EBA]."  Id. at 907.  It informed Precision that, pursuant to FAR § 15.506(a)(1), Precision could request a debriefing within three days after receipt of that letter.  Id.  Precision made its request for a debriefing by electronic mail on September 27, 2007.  See id. at 911.  The Air Force provided Precision with a written debriefing, which summarized its evaluation of Precision's proposal and stated that the Air Force's selection "was made based upon criteria specified in the provisions of the RFP, the integrated assessment of the evaluation results of all the proposals submitted, and the capability of GE . . . to fulfill the subject requirements."  Id. at 914.

On October 3, 2007, Precision filed its Post-Award Procurement Protest Complaint and accompanying motion for a preliminary injunction in this court.  The court entered a protective order on October 4, 2007.  GE, pursuant to RCFC 24(a)(2), filed an unopposed motion to intervene on October 4, 2007, which the court granted that day.

In a status report filed on October 5, 2007, defendant represented that it would not oppose Precision's motion for a preliminary injunction and that it would suspend performance of the contract awarded to GE conditioned upon an expedited briefing schedule.[26]  On October 9, 2007, the court held a status conference with the parties and, in accordance with the parties' proposal, directed defendant to file the administrative record by October 10, 2007.[27]  The filing dates for the parties' legal memoranda were suggested by the parties and adopted by the court.  On

---

[26]  October 5, 2007, GE filed its opposition to plaintiff's motion for a preliminary injunction.

[27]  Defendant filed the administrative record on October 10, 2007.  On October 17, 2007, the court granted defendant's motion to amend the administrative record to include a completed certification containing the contracting officer's signature.

October 19, 2007, defendant filed its Motion for Judgment on the Administrative Record ("Def.'s Mot."), plaintiff filed its Cross-Motion for Judgment on the Administrative Record, and GE filed Intervenor's Memorandum in Support of Defendant's Cross-Motion for Judgment on the Administrative Record and in Opposition to Plaintiff's Cross-Motion ("Def.-Inter.'s Mem.").  On October 24, 2007, Precision filed its Response to the Cross-Motion for Judgment, and defendant filed its Response in Support of Its Motion For Judgment Upon the Administrative Record ("Def.'s Resp.").[28]  On October 29, 2007, Precision and defendant filed reply briefs ("Pl.'s Reply" and "Def.'s Reply," respectively).  The court held a hearing on the parties' cross-motions on November 5, 2007 ("Hr'g Tr.").

### III.  THE PARTIES' ARGUMENTS[29]

### A.  Plaintiff's Assertions

Precision asserts that the Air Force awarded the contract to GE based upon use of a prohibited performance/price tradeoff source selection procedure.  Pl.'s Mot. 19.  Specifically, Precision claims that the Air Force was constrained by statutory mandate to determine only price and "other factors included in the solicitation" when evaluating the proposals it received.  Id. at 22 (quoting 10 U.S.C. § 2305(b)(4)(C)).  The only other factor contained in the solicitation that the Air Force was required to consider, Precision maintains, was each offeror's past performance.  Id.

The Air Force unlawfully awarded the contract to GE, Precision asserts, based upon an improper assessment of Precision's past performance.  Id. at 19-20.  The Air Force determined that Precision had no identifiable "relevant" performance history;[30] however, Precision argues that "it is only manufacturers of commercial [UFDs], not distributors, who may receive from the Air Force overall Performance confidence assessments of 'Satisfactory confidence' or better."  Pl.'s Reply 5.  Because Precision was a distributor and not a manufacturer, Precision believes that it was unable to receive a past performance rating "no better than 'Unknown Confidence.'"  Id. at 6.

---

[28]  Defendant filed a corrected copy of its response on October 25, 2007.  Although both responses are substantively identical, the court shall cite to the October 25, 2007 response.

[29]  All references to page numbers in the parties' filings are to those supplied by the court's electronic case filing system.

[30]  Precision acknowledges that "there is no such identifiable 'relevant' Performance by Precision Images, either as submitted by Precision Images with its Initial Competitive Proposal, or as submitted by Precision Images in responses to Discussions, or as found by the Air Force Performance Confidence Assessment Group."  Pl.'s Mot. 20.

Because the Air Force determined that Precision had no identifiable "relevant" performance history, Precision argues that it was entitled to an "Unknown Confidence" rating based upon the terms of the solicitation, 41 U.S.C. § 405(j)(2),[31] and FAR § 15.305(a)(2)(iv).[32] Pl.'s Mot. 20-21.  Precision acknowledges that an "Unknown Confidence" rating can be considered by the Air Force in its overall assessment of a best value determination; however, Precision contends that the terms of the solicitation, as well as the applicable statutes and regulations, preclude the Air Force from trading off an "Unknown Confidence" rating against a favorable performance rating.  Id.; Pl.'s Resp. 5.

Instead of receiving an "Unknown Confidence" rating based upon its status as a distributor, Precision argues that the Air Force engaged in a cursory evaluation of its bid and capabilities in order to assess it a "Little Confidence" rating.  Pl.'s Mot. 21.  Precision also contends that the "Little Confidence" rating it received was "arbitrary and capricious because this overall confidence assessment is not supported by the Administrative Record," id. at 19; was made without justification, see Pl.'s Reply 10-11; and did not constitute the best value, Pl.'s Mot. 21-23.  Additionally, according to Precision, the improper "Little Confidence" rating constituted the "basis" upon which the Air Force traded off Precision's past performance against a "substantial Price premium" for GE's product, which Precision alleges is of "lesser quality" than the product it proposed.[33]  Id. at 19.  As a result, Precision claims that the award to GE did not

---

[31]  Section 405(j) governs the policy regarding consideration of contractor past performance.  Subsection (2) provides:

> In the case of an offeror with respect to which there is no information on past contract performance or with respect to which information on past contract performance is not available, the offeror may not be evaluated favorably or unfavorably on the factor of past contract performance.

41 U.S.C. § 405(j)(2) (2000).

[32]  For the text of FAR § 15.305(a)(2)(iv), see supra note 12.

[33]  In its reply brief, Precision also argued that, because the Air Force failed to enumerate any specific advantages it would gain by awarding GE the contract over Precision, no basis exists for the Air Force's decision to pay a substantial price premium for GE's product of lesser quality, which could not constitute the best value to the Air Force.  Pl.'s Reply 10-11.  Precision's allegation that GE's product is of "lesser quality" stemmed from GE's exception to the Product Description's pulse width provision in which GE requested–and was granted–a deviation from 30 ns to 50 ns.  See AR 67, 317; supra Part I.A.4.a; supra note 10.  The Air Force subsequently issued Amendment 0003, modifying the pulse with requirement.  AR 99.  Because Precision believed its proposed product satisfied all of the Product Description's requirements, including the original pulse width provision, see id. at 191, 445-51, Precision argued that the Air Force's issuance of Amendment 003 constituted an impermissible accommodation for GE's product.

represent the best value to the government.  Id.

        According to Precision, the Air Force was required, when faced with no relevant past performance history for Precision, to award the contract to Precision based solely upon price. Pl.'s Resp. 6-10.  But for the Air Force's "unlawful charade," Precision contends that it "would have received [the] Award of the proposed Contract . . . ."  Id. at 10.  Rather than requesting that the court reopen the solicitation, a remedy that Precision maintains would unfairly prejudice it as a distributor that cannot set its own pricing for UFDs, Pl.'s Reply 9, Precision requests that the court order a directed award.  Id. at 11-13; Pl.'s Resp. 8-10.  A directed award to Precision is appropriate here, Precision maintains, because the Air Force's performance evaluation was unlawful, thereby leaving price–and Precision's lowest bid–as the sole criterion upon which a best value award should be based.[34]  Pl.'s Resp. 6-10.

## B. Defendant's and Defendant-Intervenor's Responses

        Defendant argues that the Air Force properly evaluated Precision's proposal under the standards set forth in the solicitation and in compliance with statutory and regulatory requirements.  Def.'s Mot. 18-23.  Specifically, defendant contends that Precision "made available to the Government performance information that allowed the Air Force to make a relevancy determination of that information in accordance with the terms of the solicitation."  Id. at 21.  Moreover, defendant argues that the administrative record demonstrates that the Air Force "properly applied the solicitation's stated relevancy criteria when it assessed Precision an overall performance rating of 'Little Confidence.'"  Id. at 22.  The administrative record demonstrates, defendant asserts, that the Air Force's "best value tradeoff rationale was reasonable and sufficiently documented."[35]  Def.'s Resp. 13.  Therefore, contends defendant, Precision's

―――――――――――――――――

Pl.'s Mot. 21-22.  While defendant argued that Precision's challenge to the terms of the solicitation was untimely, Def.'s Mot. 28; Def.'s Resp. 14-15, Precision acknowledged during oral argument that "not one of these [proposed UFDs is] better than the other.  The Air Force has admitted that . . . all these three things . . . are equal."  Hr'g Tr. 40:1-4.  Therefore, based upon Precision's counsel's concession at oral argument, it is clear that Precision has abandoned its argument that GE's UFD is inferior to Precision's UFD.  Thus, the court need not address these arguments.

        [34]  In the absence of a directed award, Precision requests that the court declare that only its proposal may be selected by the Air Force.  Pl.'s Reply 10; see infra note 38.

        [35]  Defendant also argues that Precision's allegation that GE's product was an "item of lesser quality" is untimely, not relevant, and unsupported by the administrative record, which demonstrates that GE's product satisfied the requirements listed in the Product Description. Def.'s Mot. 26-27; see supra note 33.

suggestion that the Air Force engaged in a bad faith consideration of its proposal lacks merit.[36]
Id.

Defendant also argues that Precision erroneously interpreted the solicitation terms to
suggest that the Air Force assessed a performance rating based solely upon manufacturing
experience. Def.'s Mot. 21. According to defendant, the relevancy definitions contained in the
solicitation instructed the Air Force "to take into account a broad array of performance criteria"
of which manufacturing experience or capabilities constituted only one part. Id. at 19.
Defendant therefore argues that "nowhere is it stated that to be considered relevant an example
must demonstrate some product manufacturing capability or experience." Def.'s Resp. 9. In
fact, defendant emphasizes that none of the present/past performance questionnaires submitted
by the offerors in Volume II of their proposals requested information about manufacturing
capabilities. Def.'s Reply 3. Moreover, defendant argues that Precision "submit[ted]
performance examples that [Precision] considered to be relevant" and "[a]t no time . . . did
Precision state to the Government that under [its] interpretation of the solicitation's relevancy
requirements [it] had no available record of relevant past performance information to submit–i.e.
no manufacturing experience." Def.'s Mot. 23. Therefore, defendant maintains that any claim
by Precision alleging it was penalized for not manufacturing UFDs lacks merit. Id. at 20.

Alternatively, defendant argues that, even if the Air Force erred by assigning Precision a
"Little Confidence" rather than a neutral "Unknown Confidence" rating, Precision fails to show
any prejudice. Def.'s Mot. 23-27; Def.'s Resp. 6-7; Def.'s Reply 3-6. Rather, defendant argues
that Precision "fails to devote a single sentence in its brief to explaining how it was prejudiced by
not receiving its argued-for 'Unknown Confidence' performance assessment." Def.'s Resp. 6.
Moreover, Precision fails to explain why it would have a substantial chance of receiving the
contract had it been assessed an "Uncertain Confidence" performance assessment. Id. at 7.

Defendant also disputes Precision's contention that if Precision were assessed an
"Unknown Confidence" rating, then the Air Force would have been precluded from considering
GE's positive "Satisfactory Confidence" past performance rating and would have been required
to award the contract to Precision based solely on price. Def.'s Reply 4. An award based solely
upon the lowest-priced proposal, defendant contends, "would negate the great discretion and
judgment agency officials are afforded in determining which products and services best suit the
government's needs." Def.'s Mot. 27. Furthermore, defendant contends, Precision's argument
would vitiate the entire procurement process because the acquisition specifically instructed
offerors that the Air Force would utilize a performance/price tradeoff source selection procedure,
not a procedure akin to a sealed bid where price alone would be determinative. Def.'s Reply 4-5.

---

[36] Although Precision previously asserted that the Air Force "concocted" a tradeoff, Pl.'s
Mot. 23, plaintiff's counsel represented during oral argument that Precision did not believe the
Air Force acted in bad faith. Hr'g Tr. 23:1-2.

According to defendant, because the performance/price tradeoff procedure required that the Air Force make a best value award decision, that decision "is afforded considerable discretion when determining which proposal represents the best value to the government."  Def.'s Mot. 24. Even were Precision assigned an "Unknown Confidence" rating, defendant argues that the Air Force's best value award decision was appropriate because the "Unknown Confidence" rating Precision seeks ranks lower than the "Satisfactory Confidence" rating GE received, and Precision has failed to demonstrate both that it was prejudiced by the assessment it was assigned and that it had a substantial chance of receiving the award with an "Unknown Confidence" rating.  Id. at 24-25; Def.'s Resp. 7.

Defendant argues that Precision has neither demonstrated success on the merits nor has attempted to explain how it will suffer irreparable injury in the absence of injunctive relief. Def.'s Mot. 28-30; Def.'s Resp. 15.  Instead, defendant argues that it would suffer substantial harm if injunctive relief is awarded to Precision because the awarded contract provides important maintenance devices "necessary to support the operations of the Air Force, joint DoD organizations, and FMS customers currently engaged in overseas operations."  Def.'s Mot. 30.

Lastly, defendant argues that if the court determines that the Air Force committed prejudicial error, then Precision is not entitled to a directed award.  Def.'s Reply 6.  A directed award, defendant argues, is "conceivable only where the procurement officials are left with no discretion in the award process following a court's decision on the procurement protest's merits." Id. at 7.  Defendant emphasizes that here, in a competitively negotiated procurement, the Air Force exercised considerable discretion "based on an evaluative judgment reflecting a comparative assessment of the competing proposals and trade-offs between price and non-price factors . . . ."  Id. at 8.  Thus, if the court determines that a prejudicial error occurred, then it should permit the Air Force to make a new best value tradeoff decision.  Id. at 8-9.

Similarly, GE argues that Precision was not prejudiced by the Air Force's determination because it cannot prove that it had a substantial chance of being awarded the contract with an "Unknown Confidence" rating.  Def.-Inter.'s Mem. 2-7.  According to GE, the administrative record reflects the Air Force's "affirmative confidence in GE" and demonstrates that "even if [Precision] had received an 'Unknown' rating[,] there is not a substantial chance it would have been awarded the contract."  Id. at 5.  Moreover, GE emphasizes that the "Satisfactory Confidence" rating received by both GE and the third offeror "was a favorable rating . . . not equal to a 'Neutral' or 'Unknown' confidence rating," id. at 4 n.2, and the court may consider satisfactory performance ratings as superior to neutral, unknown ratings.  Id. at 2, 4.

GE maintains that the "relative lack of confidence the [Air Force] had in Precision Images will not be mitigated simply by changing its rating to 'Unknown Confidence.'"  Id. at 5. Consequently, GE believes that Precision cannot demonstrate any prejudice, which is a required element both for standing and to prevail on the merits.  Id. at 2.  Therefore, according to GE, Precision lacks standing to pursue this post-award bid protest.  Id.

## IV.  LEGAL STANDARDS

### A.  Standard of Review

#### 1.  Jurisdiction

The United States Court of Federal Claims ("Court of Federal Claims") possesses jurisdiction over post-award bid protest actions pursuant to the Tucker Act, 28 U.S.C. § 1491(b) (2000), as amended by the Administrative Dispute Resolution Act of 1996 ("ADRA"), Pub. L. No. 104-320, 1110 Stat. 3870, 3874-76.  The Tucker Act provides that the Court of Federal Claims "shall have jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1).  Jurisdiction is "without regard to whether suit is instituted before or after the contract is awarded."  Id.  Furthermore, the Tucker Act permits the Court of Federal Claims to "award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs."  Id. § 1491(b)(2).

#### 2.  Bid Protests Under the ADRA

Under the ADRA, the Court of Federal Claims reviews the legality of an agency's decision in accordance with the standards set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 (2000).  See Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057 (Fed. Cir. 2000); Asia Pac. Airlines v. United States, 68 Fed. Cl. 8, 19 (2005); see also 28 U.S.C. § 1491(b)(4) ("In any action under [section 1491(b)], the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5.").  While section 706 enumerates several standards, the "proper standard to be applied in bid protests cases," Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004), is contained within section 706(2)(A), which provides that the Court of Federal Claims shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[37]  5 U.S.C. § 706(2)(A).

The Court of Federal Claims implements the APA standard in bid protest cases filed under the ADRA.  Banknote, 365 F.3d at 1351.  Thus, when determining whether an agency acted arbitrarily and capriciously, the court considers four factors: (1) subjective bad faith on the part of the procuring officials; (2) a reasonable basis for the procurement decision; (3) abuse of discretion by the procuring officials; and (4) violations of pertinent statutes and regulations.  Filtration Dev. Co. v. United States, 60 Fed. Cl. 371, 376 (2004) (citing Keco Indus., Inc. v.

---

[37]  Because bid protests in the absence of a hearing do not present an agency record derived from a hearing provided by statute or under 5 U.S.C. §§ 556-557, the "substantial evidence" standard under section 706(2)(E) of the APA is not applicable.  Advanced Data, 216 F.3d at 1057-58.

United States, 492 F.2d 1200, 1203-04 (Ct. Cl. 1974)).

Under the APA standard applicable in bid protest cases, the United States Court of Appeals for the Federal Circuit ("Federal Circuit") has determined that a "bid award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (citing Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970)). The protestor must show, by a preponderance of the evidence, that either ground justifies a set aside. AmerisourceBergen Drug Corp. v. United States, 60 Fed. Cl. 30, 35 (2004); see also Gulf Group Inc. v. United States, 61 Fed. Cl. 338, 351 (2004) (articulating the preponderance of the evidence standard). Review of an agency's evaluation of proposals is generally limited to the administrative record, Hamilton Sundstrand Power Sys. v. United States, 75 Fed. Cl. 512, 515 (2007), and the court may not substitute its judgment for that of the agency. Precision Standard, Inc. v. United States, 69 Fed. Cl. 738, 744 (2006).

### a. Standard Where Agency Decisions Lack Rational Basis

When a challenge alleges that the agency's decision lacked a rational basis, reviewing courts "have recognized that contracting officers are 'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process." Impresa, 238 F.3d at 1332 (quoting Latecoere Int'l, Inc. v. U.S. Dep't of Navy, 19 F.3d 1342, 1356 (11th Cir. 1994)). An agency decision lacks a rational basis where "the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" Keeton Corrs., Inc. v. United States, 59 Fed. Cl. 753, 755 (2004) (quoting Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983)). The court does not determine the correctness of the agency's decision. Ryder Move Mgmt., Inc. v. United States, 48 Fed. Cl. 380, 388 (2001). Rather, it determines "whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" Impresa, 238 F.3d at 1333 (quoting Latecoere,19 F.3d at 1356). This standard "recognizes a zone of acceptable results in each particular case and requires that the final decision reached by an agency is the result of a process that 'consider[s] the relevant factors' and is 'within the bounds of reasoned decision making.'" Axiom Res. Mgmt., Inc. v. United States, 78 Fed. Cl. 576, 588 (2007) (quoting Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 105 (1983)). Where the court finds a reasonable basis for an agency's action, it "stay[s] its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971)).

A protestor "bears a 'heavy burden' of showing that the award decision 'had no rational basis.'" Impresa, 238 F.3d at 1333 (quoting Saratoga Dev. Corp. v. United States, 21 F.3d 445,

456 (D.C. Cir. 1994)).  The standard of review, therefore, is "highly deferential" and requires the reviewing court to sustain agency action "evincing rational reasoning and consideration of relevant factors."  Advanced Data, 216 F.3d at 1058 (citing Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 283 (1974)).  Where, as here, the contract at issue is a "best value" contract, the contracting agency is afforded greater discretion.  Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004).  Additionally, where, as here, "a negotiated procurement is involved and at issue is a performance evaluation, the greatest deference possible is given to the agency–what our Court has called a 'triple whammy of deference.'"  Gulf Group, 61 Fed. Cl. at 351 (quoting Overstreet Elec. Co. v. United States, 59 Fed. Cl. 99, 117 (2003)).  Despite this highly deferential standard, "the Court must still conduct a careful review to satisfy itself that the agency's decision is founded on a rational basis."  AmerisourceBergen, 60 Fed. Cl. at 35.

### b.  Standard Where Agency Decisions Violate Regulation or Procedure

When a challenge alleges that the procurement procedure involved a violation of regulation or procedure, the protestor must demonstrate a "clear and prejudicial violation of applicable statutes or regulations."  Impresa, 238 F.3d at 1333 (quoting Kentron Haw., Ltd. v. Warner, 480 F.2d 1166, 1169 (D.C. Cir. 1996)); see also Int'l Outsourcing Servs., L.L.C. v. United States, 69 Fed. Cl. 40, 46 (2005) ("[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it." (quoting Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996))).  A protestor must satisfy both requirements–significant and prejudicial error–in order to succeed with a claim on the merits.  Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005).  In order to demonstrate prejudice, the protestor "must show that there was a 'substantial chance' it would have received the contract award absent the alleged error."  Banknote, 365 F.3d at 1351 (quoting Emery Worldwide Airlines, Inc. v. United States, 264 F.3d 1071, 1086 (Fed. Cir. 2001)); see also Statistica, Inc. v. Christopher, 102 F.3d 1577, 1582 (Fed. Cir. 1996) ("[F]or [a protestor] to prevail[,] it must establish not only some significant error in the procurement process, but also that there was a substantial chance it would have received the contract award but for that error.").

The Federal Circuit has held that a protestor can establish prejudice by showing that it had a "substantial chance" of receiving the contract award if the alleged errors in the bidding process were corrected.  Bannum, 404 F.3d at 1351; Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003); Scott v. United States, 78 Fed. Cl. 151, 154 (2007) (quoting Rex Serv. Corp. v. United States, 448 F.3d 1305, 1308 (Fed. Cir. 2006)).  The "substantial chance" test creates a "reasonable balance between the importance of (1) averting unwarranted interruptions of and interferences with the procurement process and (2) ensuring that protestors who have been adversely affected by allegedly significant error in the procurement process have a forum available to vent their grievances."  Data Gen., 78 F.3d at 1563.  Where, as in this case, judgment is made on the administrative record, "there must be facts in the record that demonstrate that plaintiff had a substantial chance of obtaining the contract."  Night Vision Corp. v. United States, 68 Fed. Cl. 368, 392 (2005); see also Bannum, 404 F.3d at 1353

(requiring a showing that, but for errors, there was a substantial chance the protestor would have received the contract award); Info. Tech., 316 F.3d at 1319 (requiring a "greater than insubstantial" chance of winning the contract award); Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (holding that a protestor must show that, but for the alleged error, it had a "substantial chance" of being awarded the contract).

The "substantial chance" requirement does not require a showing that, "but for the alleged error, the protestor would have been awarded the contract. Data Gen., 78 F.3d at 1562. Rather, the protestor must "demonstrate more than a 'mere possibility that [it] would have received the contract but for the error [in the procurement process].'"[38] Asia Pac., 68 Fed. Cl. at 18 (quoting Data Gen., 78 F.3d at 1562); cf. Myers, 275 F.3d at 1370-71 (stating that, where a protestor claims that the government was obligated to rebid the contract, as opposed to where the protestor claims it should have been awarded the contract during the original bid protest, the protestor "need only establish that it 'could compete for the contract' if the bid process were made competitive'" (quoting Impresa, 238 F.3d at 1334)).

### c. Not All Violations Warrant Set-Aside

The Competition in Contracting Act of 1984, Pub. L. No. 98-369, div. B, tit. VII, 98 Stat. 1175 (codified as amended at 41 U.S.C. § 253 (2000)), requires that agencies "evaluate sealed bids and competitive proposals, and award a contract based solely on the factors specified in the solicitation."  41 U.S.C. § 253b(a); see also 48 C.F.R. § 15.608(a) (requiring that proposals be evaluated "solely on the factors specified in the solicitation").  Thus, an agency's failure to comply with the terms of the solicitation "may constitute grounds for overturning the bid award." Advanced Data Concepts, Inc. v. United States, 43 Fed. Cl. 410, 419 (1999), aff'd, 216 F.3d

---

[38]  Although Precision initially claimed that the Air Force was required to rebid the contract, Compl. Prayer for Relief ¶ 2, it has subsequently modified that request.  Instead, Precision argues that a directed award is the appropriate remedy.  Pl.'s Resp. 8; Pl.'s Reply 11-13.  Alternatively, Precision argues that the

> Court could Declare that the only Competitive Proposal which may be selected for Award . . . is the Competitive Proposal submitted by Precision Images, and at the same time, should the Air Force elect to cancel [the solicitation] rather than proceed with an Award to Precision Images, this Court could Order that the Air Force is to terminate this Joint Service program for the supply of [UFDs].

Pl.'s Reply 13.  Therefore, based upon Precision's allegations and requested relief, the standard set forth in Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1370-71 (Fed. Cir. 2002), which discussed claims that the government rebid the contract, is not applicable here.  See Info. Scis. Corp. v. United States, 73 Fed. Cl. 70, 94 (2006) (acknowledging that the Federal Circuit "has held that the issue of prejudice may be dependent upon the type of relief sought by the parties").

1054. Not all errors, however, require that courts overturn a contract award. <u>See, e.g.</u>, <u>Metcalf Constr. Co. v. United States</u>, 53 Fed. Cl. 617, 622 (2002) (stating that "harmless errors," such as minor irregularities "committed in the course of the procurement process[,] are not sufficient grounds to warrant judicial intrusion to upset a procurement decision"). Thus, "small or immaterial errors are generally not adequate grounds for a successful protest." <u>Lockheed Missiles & Space Co. v. Bentsen</u>, 4 F.3d 955, 960 (Fed. Cir. 1993); <u>see also</u> <u>Andersen Consulting Co. v. United States</u>, 959 F.2d 929, 933 (Fed. Cir. 1992) ("It is not every bid deviation or error which automatically compels a bid rejection." (quoting <u>Excavation Constr., Inc. v. United States</u>, 494 F.2d 1289, 1293 (Ct. Cl. 1974))). Moreover, "[o]verturning awards on de minimis errors wastes resources and time, and is needlessly disruptive of procurement activities and governmental programs and operations." <u>Grumman Data Sys. Corp. v. Widnall</u>, 15 F.3d 1044, 1048 (Fed. Cir. 1994) (quoting <u>Andersen</u>, 959 F.2d at 932).

Not every violation of the APA mandates an equitable remedy; rather, a court must consider other relevant factors, such as the public interest, in granting injunctive relief. <u>PGBA, L.L.C. v. United States</u>, 389 F.3d 1219, 1225 n.4 (Fed. Cir. 2004) (stating that "injunctive relief [does] not issue as a matter of course"). In <u>PGBA</u>, the Federal Circuit affirmed a ruling by the Court of Federal Claims denying a protestor's claim for injunctive relief on "public interest grounds," though the plaintiff succeeded in establishing prejudicial error in the procurement process. <u>Id.</u> at 1223 (stating that the agency "made several prejudicial errors in its evaluations of the technical merits of PGBA's and WPS's proposals . . . however, the [Court of Federal Claims] concluded that the balance of hardships and the public interest favored allowing [the agency] and WPS to proceed with the contract"). Thus, an agency's error does not necessarily require the trial court to impose equitable relief, but instead requires the court to decide whether to issue the injunction. <u>Id.</u> at 1228-29 (listing the traditional four factors that the trial court should use in determining whether to issue a permanent injunction: "(1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief"). Because injunctive relief is relatively "drastic in nature," a plaintiff must establish that its right to such relief is clear. <u>See</u> <u>Banknote</u>, 56 Fed. Cl. at 380-81; <u>Seattle Sec. Servs., Inc. v. United States</u>, 45 Fed. Cl. 560, 566 (2000).

### 3. Judgment on the Administrative Record

Pursuant to RCFC 52.1, the Court of Federal Claims reviews an agency decision based on the administrative record.[39] <u>Bannum</u>, 404 F.3d at 1356. The standard for judgment on the administrative record, given all the disputed and undisputed facts in the administrative record, is whether the plaintiff has met the burden of proof to show that the decision was not in accordance

---

[39] The decision in <u>Bannum</u> was based upon RCFC 56.1, which was abrogated and replaced by RCFC 52.1. RCFC 52.1, however, was designed to incorporate the decision in <u>Bannum</u>. <u>See</u> RCFC 52.1, Rules Committee Note (June 20, 2006).

with law.  A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006).  The court makes "factual findings under RCFC [52.1] from the record evidence as if it were conducting a trial on the record."  Bannum, 404 F.3d at 1357.  Thus, "resolution of a motion respecting the administrative record is akin to an expedited trial on the paper record, and the Court must make fact findings where necessary."  Baird v. United States, 77 Fed. Cl. 114, 116 (2007).  Contrary to a summary judgment proceeding, genuine issues of material fact will not foreclose judgment on the administrative record.  Bannum, 404 F.3d at 1356.

## B.  Standing

Standing constitutes a "threshold requirement in every federal action."  Myers, 275 F.3d at 1369.  The court must determine standing before it reaches the merits in a bid protest case. Info. Tech., 316 F.3d at 1319.  The plaintiff bears the burden of establishing the requisite elements for standing.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992). Constituting an "indispensable part of the plaintiff's case," id., standing is "not a mere pleading requirement."  Night Vision, 68 Fed. Cl. at 391.

Under the Tucker Act, a bid protest action may be brought by an "interested party objecting to a solicitation by a Federal agency."  28 U.S.C. § 1491(b)(1).  To have standing as an "interested party," a protestor must satisfy a two-part test.  First, the protestor must demonstrate that it is an actual or prospective bidder.  Rex, 448 F.3d at 1307.  Second, the protestor must demonstrate that it has a direct economic interest in the procurement.  Id.

In addition to satisfying the "interested party" requirements under section 1491(b)(1), a protestor must also show that any alleged errors caused prejudice.  See Galen, 369 F.3d at 1330 ("[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it." (quoting Data Gen., 78 F.3d at 1562)); Textron, Inc. v. United States, 74 Fed. Cl. 277, 283 (2006) ("[A] successful protestor must also establish that the errors complained of caused prejudice.").  Therefore, "prejudice (or injury) is a necessary element of standing."  Myers, 275 F.3d at 1370.

Confusion over the standard of prejudice necessary for establishing standing exists "because, in addition to being an element of standing, a showing of prejudice is required before injunctive relief is granted."  Textron, 74 Fed. Cl. at 18; see also Bannum, 404 F.3d at 1351 (requiring that a protestor demonstrate a significant error in order to succeed on the merits); Banknote, 365 F.3d at 1351 (showing of a "substantial chance" that the protestor would have received the contract award necessary to demonstrate prejudice); cf. Rex, 448 F.3d at 1308 (requiring that a putative, prospective bidder establish that it had a "substantial chance" of receiving the contract as proof of possessing a direct economic interest).  As these cases suggest, the court "looks twice at prejudice, first weighing prejudice as it pertains to standing, and then more thoroughly weighing prejudice to determine whether plaintiff shall be afforded relief." A & D Fire, 72 Fed. Cl. at 131 n.4.  Thus, addressing questions of standing "presupposes discussion of the merits, which would lead the court in a round-robin through the arguments on

the merits in order to resolve a jurisdictional issue.  Such is not a desirable or appropriate procedure."  Textron, 74 Fed. Cl. at 284-85.

A prejudice determination for the purpose of evaluating standing is a "limited review" that seeks "minimum requisite evidence necessary for plaintiff to demonstrate prejudice and therefore standing."  Night Vision, 68 Fed. Cl. at 392 & n.23.  A merits-based determination of actual prejudice based upon the "substantial chance" test should be separate from the standing inquiry.  Textron, 74 Fed. Cl. at 285.  The court therefore adopts the approach utilized in Textron for assessing standing, which avoids a merits-based determination of actual prejudice: "requir[ing] only that a protestor be (1) either a bidder or proposer that has been prevented from bidding or proposing due to some infraction other than the terms of the solicitation itself; or (2) either a bidder or proposer who would be in contention absent the unreasonable procurement decision or violation of applicable procurement regulations."  Id.

## V.  DISCUSSION

### A.  Precision Has Standing

As discussed above, GE argues that this action should be dismissed because Precision lacks standing.  Def.-Inter.'s Mem. 1.  GE argues that, because "the RFP and the Agency's evaluation make clear that Plaintiff would not have been selected for the award," Precision was not prejudiced by the performance rating it received from the Air Force.  Id. at 2.  Defendant similarly asserts that Precision failed to establish that it was prejudiced and had a substantial chance of receiving the contract.  Def.'s Resp. 6-7.  Both parties, therefore, maintain that Precision lacks standing.  Hr'g Tr. 9:21-22.  The court, however, determines that Precision has presented the "minimum requisite evidence" necessary to demonstrate prejudice for the purpose of establishing standing.  Night Vision, 68 Fed. Cl. at 392 & n.23.

Precision satisfies the "interested party" requirement under section 1491(b)(1).  First, it is undisputed that Precision submitted a proposal to the Air Force in response to the solicitation.  See AR 386-416.  Therefore, Precision is an actual bidder.  Rex, 448 F.3d at 1307.  Second, the Air Force's decision to award the contract to GE directly affects Precision's economic interests by depriving it of a potential procurement.  Info. Scis., 73 Fed. Cl. at 94.  Precision would "no doubt benefit from receiving the award."  Hamilton, 75 Fed. Cl. at 515.  Therefore, Precision possesses the requisite direct economic interest needed to have standing.  See Rex, 448 F.3d at 1307.

The court's "initial evaluation of the administrative record is only to determine if there are sufficient facts in the record to establish standing–it does not include weighing facts and making substantive determinations on the merits."  Night Vision, 68 Fed. Cl. at 392.  The Air Force determined that Precision's proposal was within the competitive range.  See Info. Scis., 73 Fed. Cl. at 94; AR 386-416, 791.  Consequently, Precision's proposal proceeded to the Air Force's best value determination such that it was evaluated on its merits.  See Galen Med.

Assocs. v. United States, 56 Fed. Cl. 104, 108 (2003), aff'd, 369 F.3d 1324.  Based upon these facts, Precision "had more than an insubstantial chance of receiving the award," Hamilton, 75 Fed. Cl. at 512, and was in contention for the contract award.  Textron, 74 Fed. Cl. at 285. Therefore, based upon a preponderance of evidence, Precision has demonstrated standing to pursue this action.

### B.  Precision Does Not Prevail on the Merits

In order to prevail on the merits, Precision must demonstrate, by a preponderance of evidence, either that the Air Force lacked a rational basis when it awarded the contract to GE or engaged in a "clear and prejudicial violation of applicable statutes or regulations."  Impresa, 238 F.3d at 1333.  Because Precision alleges both that the Air Force's decision lacked a rational basis and violated applicable statutes and regulations, Pl.'s Mot. 23-24, the court addresses both arguments.  Before doing so, the court first addresses Precision's contention that the Air Force breached an implied-in-fact duty of good faith, fair dealing, and honest consideration of Precision's proposal.

### 1.  The Air Force's Consideration of Precision's Proposal Was Made in Good Faith

The applicable FARs under Title 48 of the Code of Federal Regulations impose upon the Air Force the affirmative duty to "[e]nsure that contractors receive impartial, fair, and equitable treatment" during the procurement process.  48 C.F.R. § 1.602-2(b).  The ADRA "supplemented (or supplanted) the implied contract cause of action with an express statutory grant of the power to award bid costs."  Beta Analytics Int'l, Inc. v. United States, 75 Fed. Cl. 155, 159 (2007) (footnote omitted).  Therefore, the Court of Federal Claims "has repeatedly stated that the implied-in-fact contract to fairly consider bids no longer survives as a basis for recovery in actions challenging consideration of a bid or proposal."  Block v. United States, 66 Fed. Cl. 68, 76 (2005).  While the Federal Circuit has not addressed whether an implied contract theory survived passage of the ADRA, see Emery, 264 F.3d at 1082 n.9, the Court of Federal Claims has "'still recognized that the issuance of a competitive solicitation which generates responsive offers gives rise to an implied contract of fair dealing.'"  Hamilton, 75 Fed. Cl. at 516 (quoting Hunt Bldg. Co. v. United States, 61 Fed. Cl. 243, 273 (2004)).

The Air Force was required to "treat all offerors equally, evaluating proposals evenhandedly against common requirements and evaluation criteria."  Banknote, 56 Fed. Cl. at 384.  Precision maintains that the Air Force failed to perform a comparative assessment of the three proposals it received, citing Nat'l Aerospace Group, Inc., B-281958, B-281959, 99-1 C.P.D. ¶ 82, 1999 WL 297804 (Comp. Gen. May 10, 1999), as precedent "precisely on point."[40]

---

[40]   While Government Accountability Office ("GAO") decisions are not binding on the Court of Federal Claims, Honeywell, 870 F.2d at 647, the court finds these decisions instructive. Tel-Instrument Elec. Corp. v. United States, 56 Fed. Cl. 174, 177 n.2 (2003) ("GAO decisions are not binding on this court, but we normally accord them deference in recognition of GAO's

Pl.'s Mot. 21.  There, the agency's best value assessment incorporated an automated, numerically scored past performance evaluation.  Nat'l Aerospace, 1999 WL 297804, at *1.  The protestor, a relatively new supplier that submitted the lowest price, received a numerical rating deemed 'neutral' because it lacked a relevant performance history under the terms of the proposal.  Id. at *2.  The agency ultimately awarded the contract based upon the offerors' numerical ratings, which reflected the fact that the awardee "represented a lesser risk of nonperformance than did [National, which] had a neutral rating . . . because it is a relatively new supplier."  Id.  The GAO concluded that the contracting officer's source selection decision failed to engage in a meaningful best value determination because

> [t]here is nothing in the record to show that the contracting officer performed a comparative assessment of the vendors.  The contracting officer merely checked a box on a form indicating that National was not selected because its [neutral] score was based on insufficient information and, therefore, was not a true indicator of its capabilities.  Nor is there any indication that the contracting officer performed a tradeoff that considered the significant price premium in ordering from [the awardee].

Id. at *3.  The Nat'l Aerospace solicitation explicitly stated that "[n]ew offeror status will not be grounds for disqualification for award," id. at *2; however, the GAO determined that the source selection decision "was tantamount to rejecting National's quotation based on its lack of past performance history."  Id. at *3.  Consequently, that decision was deemed inconsistent with 41 U.S.C. § 405(j)(2) and FAR § 15.305(a)(2).  Id.

The situation in Nat'l Aerospace is wholly distinguishable from the circumstances in the case sub judice.  The administrative record indicates that the Air Force did not engage in a cursory evaluation akin to checking a box.  To the contrary, the administrative record demonstrates that Precision's proposal was accorded equal and full consideration in accordance with the criteria contained in the EBA.  The Air Force's SSDD discussed all three offerors' proposals and supplied detailed reasoning behind the various relevancy determinations attributed to their past performance efforts.  AR 781-83.  Similarly, the PCAG's final performance report upon which the SSDD was based indicates that the Air Force engaged in a complete review of each offeror's proposal.  After a four-page discussion, the PCAG concluded that Precision neither exhibited any strengths or weaknesses.  Id. at 753.  It determined, after similar discussions, that both GE and the third offeror exhibited strengths.  Id. at 753-63.  These findings do not, however, suggest that the Air Force engaged in any disparate consideration of Precision's

---

expertise in resolving contested procurement decisions."), aff'd, 87 Fed. App'x 752 (Fed. Cir. 2004); N.C. Div. of Servs. for the Blind v. United States, 53 Fed. Cl. 147, 166 n.13 (2002) (same).  But see Data Mgmt. Servs. Joint Venture v. United States, 78 Fed. Cl. 366, 371 n.5 (2007) (stating that while the court gives "serious consideration" to the GAO's decisions, a GAO decision with respect to a particular procurement is afforded no deference, except when an agency follows a GAO recommendation and the agency action is protested in this court).

proposal.

Additionally, the SSDD indicated that the Air Force considered each offeror's cost/price evaluation carefully. The Air Force submitted several pricing EN's to each offeror, evaluated each proposal for balanced pricing and reasonableness, and determined that "all offerors were able to propose independently from one another, and they all proposed with the anticipation of competition." Id. at 785. Therefore, the Air Force's SSDD, which contained a detailed, comparative assessment of all offerors' proposals and a resulting tradeoff determination, see id. at 780-86, is unlike the source selection decision that was deemed insufficient in Nat'l Aerogroup. Consequently, Precision fails to demonstrate that the Air Force did not accord its proposal equal consideration, and its argument that the Air Force breached an implied-in-fact duty of good faith, fair dealing, and honest consideration is unsupported by the administrative record.

## 2. A Rational Basis Exists for the Air Force's Contract Award to GE

As discussed above, Precision "bears a 'heavy burden' of showing that the award decision 'had no rational basis.'" Impresa, 238 F.3d at 1333 (quoting Saratoga, 21 F.3d at 456). Where performance evaluations in a negotiated procurement are at issue, this court has characterized the standard accorded to agencies as a "triple whammy of deference." Gulf Group, 61 Fed. Cl. at 351 (quoting Overstreet, 59 Fed. Cl. at 117). As explained below, Precision has failed to satisfy its burden of showing that the Air Force had no rational basis for its decision to award the contract to GE.

Precision argues that the Air Force's award lacks a rational basis because its SSDD failed to include a meaningful best value determination. It cites HoveCo, B-298697, 2006 C.P.D. ¶ 171, 2006 WL 3457630 (Comp. Gen. Nov. 14, 2006), in support of its argument.[41] The solicitation in HoveCo, similar to the Air Force's solicitation at issue here, advised offerors that an award would be made to the offeror whose proposal "represent[ed] the best value to the government. Best value was to be determined on the basis of a trade-off between past performance and price, with past performance considered significantly more important than price." Id. at *1. The performance confidence ratings in HoveCo–high confidence, significant confidence, satisfactory confidence, unknown confidence, little confidence, and no confidence–were identical to those in the Air Force's solicitation. Id.; cf. AR 130-31 (defining the same performance confidence ratings). HoveCo argued that a lack of relevant past performance could be rated neither favorably nor unfavorably. HoveCo, 2006 WL 3457630, at *3. Because it lacked a record of relevant past performance, HoveCo believed it should have received a neutral unknown confidence rating rather than "the unfavorable rating of little confidence." Id. The GAO denied HoveCo's protest because the source selection document

---

[41] Conversely, GE argued that HoveCo is directly on point and "precisely supports the government's position" that Precision failed to demonstrate competitive prejudice. Hr'g Tr. 35:5-7; see infra Part V.B.3.b.

"focused on the advantages associated with [the awardee's] greater experience and not simply the difference between the two offerors' performance confidence ratings . . . ." Id.

Precision maintains that HoveCo supports its position that the Air Force's SSDD is deficient and that the award lacks a rational basis. Pl.'s Reply 6-7. Precision focuses upon the apparent language contained in the HoveCo source selection decision and asserts that it survived challenge because the agency "focused precisely on the advantages associated with one offeror's greater experience and didn't have anything to say about the difference in the performance confidence ratings." Tr. 21:15-19. Precision argues that the Air Force's SSDD cannot withstand similar scrutiny because it failed to include the same assessment. Pl.'s Reply at 10. Instead, Precision believes that the SSDD was devoid of a rational explanation for the best value award to GE because the SSDD's decision page focused exclusively upon Precision's performance deficiencies and not GE's advantages.[42] Id.; Tr. 21:5-11 (discussing the final page of the SSDD in which the decision was rendered and explaining that the Air Force contracting officer could have "decided based on perceived advantages [of] the GE offer that a best value decision would merit the paying of a price premium").

Precision's argument is unpersuasive. While the source selection decision in HoveCo discussed advantages the awardee possessed over the protestor in that case, HoveCo does not require that the SSDD separately identify or enumerate an offeror's strengths or advantages in order for a best value decision to be sustainable. In fact, HoveCo states only that "it is clear from the source selection decision document that the SSA considered [the awardee's] proposal to be worth its higher price because [the awardee] had demonstrated through its present and past performance that it had the capabilities and experience necessary to handle the requirement." HoveCo, 2006 WL 3457630, at *3 (emphasis added).

The court does not adopt Precision's narrow construction of the SSDD decision page. Rather, the court finds that the SSDD's decision page is not separate and distinct from the discussion immediately preceding it. Although the decision page does not specifically mention any of GE's advantages or strengths and, in fact, constitutes only three paragraphs, it did not need to do so. Rather, the decision page represents the culmination of seven pages of detailed analysis of and findings related to the three offerors' proposals. AR 779-85. Within those seven pages are individual present and past performance and cost/price evaluations for each offeror. Id. The language of the SSDD is virtually identical to the findings contained in the PCAG final performance report, and it is apparent that the SSDD incorporated the PCAG's conclusions. Compare id. at 752, with id. at 781; compare id. at 758, with id. at 782; compare id. at 762, with id. at 783 (demonstrating that the language contained in the SSDD was nearly identical to the

_____

[42] Precision suggests that the decision page of the SSDD could have detailed GE's past performances and fully explained those efforts. See Hr'g Tr. 41:18-21. Precision adopts the position that, had the decision page of the SSDD included a more meaningful assessment, the SSDD would have complied with the source selection decision language upheld in HoveCo. See id. at 42:5-13.

language contained in the PCAG report).  The PCAG's final performance report specifically identified strengths accorded to GE and the third offeror while finding neither strengths nor weaknesses for Precision.  Id. at 753, 759, 763.  But see Hr'g Tr. 22:5-7 (articulating Precision's position that "[t]he performance confidence assessment group is not the contracting officer").  Thus, while the SSDD may not have explicitly enumerated GE's strengths in its decision page, the discussion culminating in the SSDD's decision demonstrates that those strengths were an integral part of the Air Force's best value determination.

A review of the entire SSDD supports this conclusion.  The SSDD incorporated GE's strengths or advantages into its discussion of GE's proposal, thereby rendering it unnecessary and redundant to reiterate a summary of those findings in the decision page.  Like the source selection decision document in HoveCo, the Air Force's SSDD stipulated that GE's "efforts demonstrate the technical expertise in manufacturing [UFD's] essentially the same as those involved in the instant requirement."  AR 783 (emphasis added).  Additionally, the SSDD concluded that GE "has demonstrated, in a limited degree, the logistical capabilities in the areas of vendor support, production line oversight, invoicing, warranty issues, and other associated program features."  Id. (emphasis added).  Precision's argument that these findings are absent from the Air Force's decision page ignores the totality of the SSDD.  It is clear that the Air Force's SSDD identified the reasons for GE's selection such that the Air Force could make a rational, reasoned best value determination.

Precision bears the burden of demonstrating that the Air Force acted irrationally in determining that GE's proposal constituted the best value.  See Bannum, 404 F.3d at 1351.  The court finds that the Air Force considered the relevant factors identified in its solicitation and provided a coherent and reasonable explanation for its best value determination and contract award to GE.  All Precision has argued is that the SSDD should have incorporated the same tradeoff discussion as the source selection document upheld in HoveCo.  Ultimately, the Air Force's SSDD supplied that discussion but did so throughout the document rather than separately within the decision section.  The court is satisfied that the Air Force's determination was rationally based.

### 3.  Precision Has Not Demonstrated Significant and Prejudicial Errors in the Air Force's Procurement Process

In addition to arguing that the Air Force's award lacked a rational basis, Precision maintains that the Air Force unlawfully discriminated against it and was required to assign it an "Unknown Confidence" rating, which reflected Precision's failure to provide relevant performance data.  Pl.'s Mot. 19; Pl.'s Reply 5.  Precision argues that it was entitled to an "Unknown Confidence" rating but was precluded from any higher assessment because, as a distributor, it lacked manufacturing experience, which it believes was required for a "Satisfactory Confidence" rating or higher.  Pl.'s Reply 5-6.  Precision further argues that the "Little Confidence" rating it received was arbitrary, capricious, and in violation of the terms of the solicitation, 41 U.S.C. § 405(j)(2), and FAR § 15.305(a)(2)(iv).  Pl.'s Mot. 20.  In order to

succeed on the merits, Precision must show that the Air Force's error was both significant and prejudicial. Bannum, 404 F.3d at 1351. In other words, Precision must prove that it had a "substantial chance" of receiving the contract award if it was assigned the "Unknown Confidence" rating. Banknote, 365 F.3d at 1351. As explained below, Precision has not satisfied its burden.

### a. Precision Was Not Prejudiced Because of Its Status as a Distributor

Precision believes that it was prejudiced by the Air Force's determination that it had no relevant past performance because "only Performance involving manufacture of [UFDs]" would be deemed relevant under the terms of the EBA. Pl.'s Reply 5. Precision acknowledges a lack of "identifiable 'relevant' Performance" within its proposal and does not dispute that determination by the Air Force's PCAG. Pl.'s Mot. 20. However, it contends that, because it is "admittedly not a manufacturer," its status as a distributor precluded it from receiving any "relevant" performance rating under the terms of the solicitation. Pl.'s Reply 6. Thus, Precision maintains that "what the government did was the unlawful thing of giving [Precision] an unfavorable evaluation because [it is] a distributor." Hr'g Tr. 22:16-18.

Precision has not, however, established that the manufacture of UFDs was the sole prerequisite for receiving any "relevant" performance rating. Precision acknowledges that the EBA involved an "elaborate scheme for the Air Force to rank 'relevant' Performance ('Very Relevant,' 'Relevant,' 'Somewhat Relevant,' or 'Not Relevant')." Pl.'s Reply 5. The EBA indicated that manufacture of UFDs comprised one example of a relevant effort under the "Very Relevant," "Relevant," and "Somewhat Relevant" definitions; however, other criteria were also included. AR 129-30; see supra Part I.A.3.a. According to the EBA, the Air Force would examine "logistical and programmatic considerations such as total quantity produced and/or quantity produced per month, duration of time, program dollar value, and type of contract." AR 130. Additionally, neither the FACTS Sheets Precision completed nor the present/past performance questionnaires Precision's customers were asked to complete requested information about any manufacturing capabilities. Id. at 132-36, 140-43.

In response to this solicitation for UFDs, Precision submitted FACTS Sheets for purchase orders of high speed film. Id. at 611-30. The administrative record reflects that Precision apprised the Air Force that its past performance information has "historically been for other products." Id. at 386. Precision also acknowledged on each FACTS Sheet that its previous efforts involved different items than those sought in the solicitation. See id.; supra Part I.A.4.b. Nonetheless, Precision highlighted what it believed were relevant facets of these efforts, namely its ability to timely deliver quantities, track the progress of orders, and monitor manufacturers' supplies. AR 613, 618-19, 623, 628.

The Air Force determined that these efforts were not relevant. Id. at 749-51. While its SSDD acknowledged that a manufacturing element was present in the "Very Relevant," "Relevant," and "Somewhat Relevant," definitions, id. at 781, additional factors informed the Air

Force's evaluation of Precision's proposal and determination that previous efforts were not
relevant:

> [   ].

Id. (emphasis added).  Moreover, after "[c]onsidering the information available to the PCAG"
and "[c]onsidering the aggregate of the efforts . . . submitted for evaluation," Precision [   ].  Id.
(emphasis added).

The court concludes that the Air Force's determination of relevant past performance
considered manufacturing capabilities as only one factor among many.  Nowhere does the
administrative record suggest that Precision was precluded from competing for the contract based
upon its status as a distributor.  Rather, the Air Force accorded Precision's proposal the same
attention and consideration as the other offerors who possessed manufacturing capabilities.
Therefore, Precision fails to establish that its lack of manufacturing capability prevented a past
performance assessment of no higher than "Not Relevant."  As a result, Precision has not
demonstrated that, as a distributor, it was prejudiced by the Air Force's evaluation of its
proposal.

**b.  Precision Has Not Proven That It Had a Substantial Chance of Receiving the Contract
With an "Unknown Confidence" Rating**

Precision also alleges that it was prejudiced because it "has not received a reasoned
judgment" from the Air Force.  Compl. ¶ 4.  Precision argues that the Air Force was required to
assign it an "Unknown Confidence" rating due to its lack of relevant performance history.  Pl.'s
Mot. 19.  Instead, the Air Force assessed Precision with an overall rating of "Little Confidence,"
which Precision argues is unsupported by the administrative record.  Id. at 16-17.

The EBA defined an "Unknown Confidence" rating as "[n]o performance record
identifiable" and incorporated the provisions of FAR § 15.301(a)(2)(iii)-(iv) into that definition.
AR 130.  Defendant interprets these provisions, as well as section 405(j)(2), to require an
"Unknown Confidence" rating only where no past performance information is available.  Def.'s
Resp. 11.  Defendant asserts that Precision "presented a record of performance to the Air Force-
its four film sales purchase orders, that allowed the Government to make a proper confidence
assessment of the contractor's ability . . . ."  Id. at 12.  Thus, defendant maintains that the "Little
Confidence" rating Precision received is supported by the administrative record and does not
violate applicable statutes or regulations.  Id. at 10-12.

The court agrees with defendant's statutory interpretation.  Section 405(j)(2) states that
"[i]n the case of an offeror with respect to which there is no information on past contract
performance or with respect to which information on past contract performance is not available,
the offeror may not be evaluated favorably or unfavorably on the factor of past contract
performance."  41 U.S.C. § 405(j)(2) (emphasis added).  Nowhere does section 405(j)(2) require

that submitted past contract performance data be relevant.  Here, Precision's past contract performance information was available because it furnished five examples to the Air Force, which proceeded to consider Precision's submissions.  See AR 781.  Under section 405(j)(2), the Air Force could have evaluated Precision's past contract performance history either favorably or unfavorably because Precision submitted past performance information.  Thus, a "Little Confidence" rating could be assessed to Precision under section 405(j)(2).

The same cannot be said for the regulations incorporated into the EBA.  The "Unknown Confidence" rating defined "[n]o performance record identifiable" to include "the case of an offeror without a record of relevant past performance."  FAR § 15.305(a)(2)(iv) (emphasis added).  Here, the regulations differ from the statute.  Unlike the latter, which addresses the lack or unavailability of any past performance information, the former specifically addresses circumstances where no relevant past performance information exists.  The Air Force evaluated Precision's four firm-fixed price contracts and determined that "[a]ll four efforts described on [Precision's] FACTS Sheets are considered not relevant to the instant requirement . . . ."  AR 781 (emphasis added).  That determination was based upon Precision's [   ] required under the solicitation.  Id. at 749-51.  Because it found that Precision lacked a record of relevant past performance, the Air Force should have assessed Precision with an "Unknown Confidence" rating under the terms of the solicitation and FAR § 15.305(a)(2)(iv).  Consequently, the Air Force's "Little Confidence" rating for Precision violated FAR § 15.305(a)(2)(iv).

Because the court finds that the Air Force violated FAR § 15.305(a)(2)(iv), it must analyze whether Precision was prejudiced by this error.  Textron, 74 Fed. Cl. at 329.  The Air Force's error in assessing Precision with a "Little Confidence" rating instead of an "Unknown Confidence" rating must be both significant and prejudicial.  Banknote, 365 F.3d at 1351; Alfa Laval, 175 F.3d at 1367.  First, Precision must show that the Air Force's erroneous "Little Confidence" rating is significant enough to warrant injunctive relief.  Unified Architecture & Eng'g, Inc. v. United States, 46 Fed. Cl. 56, 66 (2000); Hydro Eng'g, Inc. v. United States, 37 Fed. Cl. 448, 477 (1997).  Although a violation of an applicable procurement regulation may constitute a significant error in the procurement process, see Al Ghanim Combined Group Co. Gen. Trad. & Const. W.L.L. v. United States, 56 Fed. Cl. 502, 516 (2003), not every violation or error requires that a procurement award be overturned.  See Grumman, 15 F.3d at 1048; Metcalf, 53 Fed. Cl. at 622.  Rather, Precision must prove that the Air Force's assessment of "Little Confidence" was greater than a small or immaterial error.  Lockheed, 4 F.3d at 960.

Second, Precision must show that the Air Force's erroneous "Little Confidence" rating was prejudicial.  S. Foods, Inc. v. United States, 76 Fed. Cl. 769, 777 (2007) ("[A] protester must still show that a significant error in the procurement process, even if it involved a violation of a procurement regulation, was prejudicial.").  In order to establish prejudice, Precision must demonstrate that "there was a substantial chance it would have received the contract award but for [the Air Force's] error."  Alfa Laval, 175 F.3d at 1367 (quoting Statistica, 102 F.3d at 1582).  The court "consider[s] all the surrounding circumstances in determining whether there was a substantial chance that [Precision] would have received an award but for a significant error in the

procurement process." <u>Textron</u>, 74 Fed. Cl. at 329.  As explained below, Precision fails to meet its burden of showing its "Little Confidence" rating constituted a significant, prejudicial error in the procurement process.

Precision acknowledges that the EBA ranked overall confidence in relevant performance on a scale descending in importance: "High Confidence," "Significant Confidence," "Satisfactory Confidence," "Unknown Confidence," "Little Confidence," and "No Confidence."  AR 130; Pl.'s Reply 5.  The EBA stipulated that an "Unknown Confidence" rating would be considered in the overall assessment of a best value decision.  AR 130.  Both GE and the third offeror received performance ratings of "Satisfactory Confidence."  <u>Id.</u> at 786; <u>see also</u> Pl.'s Reply 6 (acknowledging that the competing offerors "have each received overall Performance confidence assessments no better than 'Satisfactory Confidence'").  Precision maintains that the "Satisfactory Confidence" ratings GE and the third offeror received were "the lowest grade they could get as a manufacturer," Hr'g Tr. 41:14-15, but disputes that these ratings are superior to an "Unknown Confidence" rating.  <u>Id.</u> at 40:25-41:1.

While there is no explicit language in the EBA indicating that a neutral "Unknown Confidence" rating could be considered less favorable than a "Satisfactory Confidence" rating, AR 130-31; <u>cf.</u> <u>Gulf Group, Inc. v. United States</u>, 56 Fed. Cl. 391, 394 (2003) (indicating that the solicitation stated that a neutral rating could be considered less favorable), the parties agree that the EBA's rating system is built upon a hierarchy.  <u>See</u> Pl.'s Reply 5; Def.'s Mot. 25; Def.-Inter.'s Mem. 3.  The rating scale contained in the EBA is identical to the rating scale discussed in <u>HoveCo</u>.  <u>Compare</u> <u>HoveCo</u>, 2006 WL 3457630, at *1 <u>with</u> AR 130-31 (containing the same confidence ratings).  Here, a rating of "Satisfactory Confidence" is listed above–and is therefore ranked higher than–ratings of "Unknown Confidence," "Little Confidence," and "No Confidence" in the EBA.  Because an "Unknown Confidence" rating "would be considered" under the terms of the EBA, AR 130, the Air Force could properly consider the difference between a higher-priced offeror with a "Satisfactory Confidence" rating over a lower-priced offeror with an "Unknown Confidence" rating.  <u>Gulf Group</u>, 56 Fed. Cl. at 399 (citing <u>W. Coast Unlimited</u>, 99-2 C.P.D. ¶ 40, 1999 WL 644444, at *4 (Comp. Gen. Aug. 18, 1999)).

Significantly, Precision does not claim that a change in its performance assessment from a "Little Confidence" rating to an "Unknown Confidence" rating would have improved its proposal and its chance of securing the contract.  <u>See</u> <u>Info. Tech.</u>, 316 F.3d at 1319.  Precision never argues that it is entitled to a "Satisfactory Confidence" rating.  It only asserts that it was entitled to a neutral "Unknown Confidence" rating.  Pl.'s Mot. 19; <u>see also</u> Hr'g Tr. 37:17-20 ("[Precision is] not asking for a favorable evaluation.  [It is] asking for a not unfavorable evaluation[,] and that's precisely what [it] got.").  The court therefore determines that Precision has not proven that the Air Force's error in assigning Precision a "Little Confidence" rating was significant.

Even if the Air Force's error in assigning Precision a "Little Confidence" rating was significant, Precision has not proven that the error had a prejudicial effect.  Had Precision been

assessed an "Unknown Confidence" rating in compliance with FAR § 15.302(a)(2)(iv), the EBA demonstrates that such a rating is not equivalent to the "Satisfactory Confidence" rating GE received. See AR 130. To the contrary, an "Unknown Confidence" rating, while greater than a finding of "substantial doubt" that an offeror will successfully perform as defined in the "Little Confidence" rating, does not constitute an affirmative finding of "confidence" defined in the "Satisfactory Confidence" rating. Id. at 130-31. Rather, an "Unknown Confidence" rating represents neither a favorable nor unfavorable confidence assessment. Based upon the hierarchy contained in the EBA, this rating still ranks lower than a "Satisfactory Confidence" rating, which is assessed upon an affirmative finding that confidence exists. Id. at 130. Precision has not established that an "Unknown Confidence" rating is either equivalent or superior to the "Satisfactory Confidence" ratings earned by its competitors such that it had a substantial chance of securing the contract absent the Air Force's error.

The administrative record indicates that the Air Force would have engaged in the same tradeoff and determined that GE represented the best value under the terms of this solicitation even if it assessed Precision with an "Unknown Confidence" rating. Precision did not contest defendant's contention that

> the government is entering [into] a long-term relationship with a contractor for a very important piece of equipment that goes beyond a simple delivering of a commercial item. They're entering into a five-year relationship for 700 of these items, in which there's going to be performance testing and verification, product support, [and] warranty support . . . . It's not a simple delivery of camera film.

Hr'g Tr. 27:7-17. It is clear that the Air Force's erroneous confidence assessment of Precision's past performance history was not prejudicial. Precision never argued that it should have received a confidence rating equivalent to or greater than the ratings assessed to GE and the third offeror, see id. at 37:17-18, and has not proven that, with an "Unknown Confidence" rating, it would have had a substantial chance of being awarded the contract. See HoveCo, 2006 WL 3457630, at *3 (indicating that the outcome "would remain the same regardless of whether HoveCo's proposal was assigned a rating of little confidence or a rating of unknown confidence").

Rather than explaining how it could have had a substantial chance of being awarded the contract with an "Unknown Confidence" rating, Precision instead attacks the validity of the performance/price tradeoff source selection procedure that resulted in its "Little Confidence" assessment. Precision maintains that the procedure was flawed because the Air Force awarded GE the contract by unlawfully trading off Precision's performance evaluation against GE's higher bid proposal. Pl.'s Mot. 22; Pl.'s Reply 4. Because it maintains that the "Little Confidence" rating it received constituted the sole basis upon which the Air Force traded-off Precision's performance against its lowest price bid proposal, Pl.'s Mot. 19, Precision argues that the performance evaluation was unlawful and that the award must be made solely on price. Pl.'s Resp. 6-7. Since its proposed price was [   ] lower than GE's bid and [   ] lower than the Air Force's own estimate, Precision believes that it is entitled to the contract award. Id. at 6-8.

This argument suggests that Precision would have a substantial chance of receiving the contract if it was awarded based solely upon price.  See id.  This argument would be valid if the solicitation was a FAR Part 14 sealed bid in which price was the only determining factor.  See FAR § 14.101(e) (indicating that a sealed bid award "will be made . . . to that responsible bidder whose bid . . . will be most advantageous to the Government, considering only price and the price-related factors included in the invitation").  This solicitation, however, was a FAR Part 15 negotiated procurement.  See FAR § 15.302 ("The objective of source selection is to select the proposal that represents the best value.").

The terms of this FAR Part 15 negotiated procurement clearly indicated that two factors, performance and price, would comprise the Air Force's determination.  AR 129.  Both the Presolicitation Notice and the solicitation itself informed offerors that the Air Force would utilize a performance/price tradeoff source selection procedure.  Id. at 93-94, 129.  The EBA explained that, within this tradeoff between present/past performance and price, performance was "considered significantly more important than price."  Id. at 129.  Precision's argument that it should be awarded the contract based upon its lower price, therefore, is contrary to the solicitation terms, which specifically precluded a best value award based solely upon price, see id., and lacks merit.

This case differs from Information Sciences, where the court, utilizing the Myers standard for determining prejudice, see supra note 38, found that the protestor had a substantial chance of receiving the contract in a best value determination procurement that combined both price and technical considerations.  Info. Scis., 73 Fed. Cl. at 94.  There, all of the proposals were compared against the eventual awardee's proposal rather than against each other, and the best value determination "did not yield a numerical score," rendering it "impossible to conclude which of the three unsuccessful offerors followed [the awardee] in the 'best value' hierarchy." Id.

Here, the administrative record clearly reflects that the Air Force considered each proposal against each other and not against only GE's proposal.  AR 779-86.  Although the Air Force did not assign offerors a numerical score, its SSDD indicated that GE's bid ranked first because, while the third offeror also received a "Satisfactory Confidence" assessment, GE's bid "offer[ed] the lowest price [between] the two."  Id. at 786.  Precision's proposal, by contrast, "failed to demonstrate . . . that it has the experience to successfully perform the complexity, magnitude, and scope" of the solicitation.  Id.  Thus, Precision's proposal was compared against both GE's and the third offeror's proposals, unlike in Information Sciences.  Moreover, the SSDD suggests that Precision's bid was ranked third.  Id. at 786; cf. United States v. Int'l Bus. Machs. Corp., 892 F.2d 1006, 1010-12 (Fed. Cir. 1989) (finding that a bidder rated below second lacked a "direct economic interest in the award of the contract" and therefore lacked standing).

In sum, Precision has presented no evidence that the "Unknown Confidence" rating it believes it should have received would have improved its proposal and its chance of securing the contract.  Instead, Precision merely requests a "not unfavorable" evaluation that can compete

against two other offerors' affirmatively favorable evaluations.  Hr'g Tr. 37:17-20.  As such, this is not a case in which Precision's allegations warrant interference into the procurement process because the errors it seeks to redress were not significant and prejudicial.  See Data Gen., 78 F.3d at 1563.  The court holds that the Air Force supplied a reasonable basis for–and did not abuse its discretion or act arbitrarily and capriciously by–awarding the contract to GE and engaged in good faith consideration of all proposals it received.  The court further holds that the Air Force's violation of FAR § 15.305(a)(2)(iv) had no substantial and prejudicial effect upon Precision or the outcome of the procurement.[43]

## VI.  CONCLUSION

For the foregoing reasons:

1.  Defendant's motion for judgment on the administrative record is **GRANTED**.

2.  Plaintiff's cross-motion for judgment on the administrative record is **DENIED**.

3.  The court has issued this opinion under seal in accordance with the court's Protective Order.  The parties are directed to file a proposed redacted copy of this opinion, with any material deemed proprietary enclosed in brackets, **no later than November 27, 2007**.

4.  Each party shall bear its own costs.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge

---

[43]  Because the court determines that the government is entitled to judgment on the administrative record, the court need not address Precision's argument regarding entitlement to a directed award or injunctive relief.  Consequently, Precision's request for a directed award or injunctive relief is denied.